UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

JEREMY ZIELINSKI, on behalf of himself           VERIFIED COMPLAINT
and all others similarly situated,               42 U.S.C. § 1983

                Plaintiff,         Jury Trial Demanded

  v.                                             Case No. _____

ANTHONY ANNUCCI; JPAY, LLC;
JULIE WOLCOTT; and D. LEONARD,

           Defendants.

--------------------------------------------------------



    Plaintiff JEREMY ZIELINSKI alleges and shows:

## INTRODUCTION

    1.   This is a civil rights action brought pursuant to 42 U.S.C. § 1983. It challenges arbitrary, retaliatory and otherwise unlawful censorship of electronic correspondence to and from incarcerated individuals in custody of the New York State Department of Corrections and Community Supervision ("DOCCS").

## JURISDICTION AND VENUE

    2.   This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the material events took place in this district.

## PARTIES

    3.   Plaintiff JEREMY ZIELINSKI ("Plaintiff") is an incarcerated individual serving a term of imprisonment in DOCCS custody.

    4.   Defendant ANTHONY ANNUCCI ("Annucci") is or purports to be the "Acting Commissioner" of DOCCS.

5.   Defendant JPAY, LLC ("JPay") is a corporation doing business in New York State headquartered at 3450 Lakeside Drive, Suite 100, Mirimar, FL 33027.

6.   Defendant JULIE WOLCOTT ("Wolcott") at all relevant times was the Superintendent of Attica Correctional Facility ("Attica").

7.   Defendant D. LEONARD ("Leonard"), whose full name is known to Annucci and Wolcott, at all relevant times was a Lieutenant and "Acting Captain" at Attica.

8.   At all times relevant herein, the defendants were acting under color of state law, custom and/or usage.

## CLASS ACTION ALLEGATIONS

9.   Plaintiff brings this action as a putative class action on behalf of himself and all other similarly situated individuals, the class consisting of all individuals in DOCCS custody who have used or will use the electronic correspondence system at issue here to transmit or receive electronic correspondence (the "Class").

10.   A class action is authorized here because:

A.   The class is so numerous that joinder of all members is impracticable, as it has tens of thousands of members and changes constantly;

B.   There are questions of law and fact common to the Class, including but not limited to whether the defendants' policies and customs are unconstitutional or otherwise unlawful;

C.   Plaintiff's claims are typical of those of the Class as a whole; and

D.   Plaintiff will fairly and adequately represent the interests of the Class, as he has a personal stake in a successful outcome, and will secure representation by experienced class counsel before seeking class certification.

11.   A class action is appropriate here because:

2

A.   Inconsistent or varying adjudications by individual Class members on typical claims would establish incompatible standards of conduct for the defendants;

B.   Adjudications with respect to individual Class members would, as a practical matter, be dispositive of other Class members' claims;

C.   The defendants have acted and refused to act on grounds that apply generally to the Class, so final relief is appropriate for the Class as a whole;

D.   Common questions of law and fact predominate over questions affecting only individual Class members; and

E.   A class action is superior to other methods for resolving the controversy, as discovery on the defendants' policies and customs and their application will be more efficient and effective if done with respect to the Class as a whole, and a class action will thus conserve judicial and party resources and expedite resolution of the controversy.

## FACTS

12.  In 2017 DOCCS entered a contract with JPay to make tablet computers and related infrastructure available to the incarcerated population for, among other things, electronic correspondence between incarcerated people and contacts in the community. Relevant excerpts are attached as Exhibit P0002.[1]

13.  The contract was negotiated, reviewed and personally approved by Annucci and has since been renewed on substantially the same terms.  Most of the population now has tablets and electronic correspondence is a primary means of communication, and for many contacts the only way they can be reached.

14.  The electronic correspondence system was designed and is operated jointly by JPay and DOCCS.  Some, but not all, of its implementation details are set out in DOCCS Directive #4425, a copy of which is attached as Exhibit P0001.

3

15.  When the contract was entered, Annucci and JPay also conspired to deprive incarcerated people in DOCCS custody and their community contacts of constitutionally protected rights relating to electronic correspondence.

16.  In furtherance of the conspiracy the defendants have taken the following overt acts, among others:

17.  The defendants have broadly taken the position that electronic correspondence is not protected by any of the procedural or substantive rules of law, including constitutional rights, that protect conventional physical correspondence.

18.  The defendants explicitly take the position that no electronic correspondence is privileged, even with attorneys, government oversight agencies, elected officials, the courts, journalists, medical professionals, and religious advisors.

19.  The defendants have refused to promulgate any formal regulations relating to electronic correspondence.   Instead they have designed and implemented informal policies and customs claiming unfettered discretion and authority to read, detain and destroy any inbound or outbound electronic correspondence, and resolve whether to do so on an ad hoc, case-by-case basis with no meaningful standards.

20.  The defendants built and operate computer systems and interfaces that allow DOCCS employees, and JPay employees acting at DOCCS's request and on its behalf, ("Employees") to read, detain or destroy any inbound or outbound electronic correspondence with or without notice to the sender or recipient.

21.  The defendants built and operate computer systems and interfaces that allow Employees to destroy electronic correspondence already sent or received by remotely deleting it from incarcerated individuals' tablets and community contacts' "inbox" and "sent box" without notice or any process whatsoever.

4

22.   The defendants and other Employees have persistently abused these computer systems and interfaces to the injury of incarcerated people and their community contacts, including but not limited to in the following ways:

23.   The defendants and other Employees routinely read, detain and destroy electronic correspondence that is critical of or reports abuse by facility staff or DOCCS as a whole; or that seeks or relates to reporting misconduct and poor prison conditions to elected officials, lawyers, law enforcement, oversight agencies, journalists, the courts, and the general public.

24.   The defendants have configured the computer systems and interfaces to "hold" all inbound and outbound electronic correspondence by default and only allow delivery to its addressee if it is "released" by an Employee.   The defendants and other Employees routinely abuse this "censor by default" system to "shadow block" inbound and outbound electronic correspondence by leaving disfavored messages in "review" status indefinitely, which prevents their delivery without giving notice or reasons.

25.   The defendants and other Employees routinely read inbound and outbound electronic correspondence to spy on, thwart, attempt to gain unfair advantages in opposing, and plan retaliation for, grievances, lawsuits, and other protected activities; and to plan and implement coverups of official misconduct.

26.   The defendants and other Employees routinely destroy evidence of their overt acts by remotely deleting electronic correspondence already sent or received from incarcerated individuals' tablets and community contacts' "inbox" and "sent box" without notice or any process whatsoever.

27.   The defendants have configured the computer systems and interfaces to allow, but not require, Employees to cause electronic delivery of a notice that a particular article of electronic correspondence has been "censored" which has fields for "reasons" and "comments."   Even when Employees actually use this

feature, they routinely:

    A.   give nonsensical, vague, and/or pretextual "reasons";

    B.   do not identify which message has been "censored";

    C.   do not send the notice to both parties to the message;

    D.   do not notify the addressee who the message was sent by;

    E.   leave the "comments" field blank; and/or

    F.   provide no notice of any opportunity or mechanism to appeal.

28. JPay derives significant profit from the abuse it facilitates by DOCCS employees. A fee is charged any time an article of electronic correspondence is transmitted into the system, regardless of whether it is ultimately delivered. When an Employee "shadow blocks" a message, naive users often mistake it for a system error and retransmit the message at additional expense, and when a message is explicitly "censored," the sender is charged for it anyway.

29. The persistent abuse has a substantial "chilling effect" on and interferes with use of electronic correspondence for constitutionally protected activities.

30. Plaintiff has repeatedly been the target of the defendants' abuse of the electronic correspondence system, including but not limited to the following recent instances:

31. From April, 2021 to September, 2022 Plaintiff was at Attica. DOCCS Directive #4425 states that "reviews" of electronic correspondence shall be done by staff at the rank of Lieutenant or higher, and that message "rejections" can be "appealed" by writing to the Superintendent. At Attica these roles were filled by defendants Leonard and Wolcott, respectively.

32. In May 2022 Plaintiff filed a lawsuit in state court (Zielinski v. Annucci, et al., Albany Co. Sup. Ct., Index #3771-22) challenging an attempt by Annucci to ban family and friends from sending incarcerated people food

packages.   Leonard and Wolcott subsequently blocked numerous messages relating to that lawsuit, including news articles critical of the policy, communications from advocacy groups coordinating lawful opposition to it, and Plaintiff's attempts to inform the public of the case and gather evidence in support of the claims from family, friends and other incarcerated people.   In an attempt to thwart any challenge to their activities, Leonard and Wolcott even blocked messages that contained nothing but the dates and times messages which had been unlawfully blocked were transmitted.

33.  On or about August 9, 2022 defendants Leonard and Wolcott shadow blocked outbound correspondence to a journalist who was reporting on Plaintiff's litigation that identified religious freedom violations being caused by the new policy, was generally critical of DOCCS, and reported general prison reaction to the FBI's search of Donald Trump's home.

34.  On or about August 21, 2022 defendants Leonard and Wolcott shadow blocked outbound correspondence containing an op-ed Plaintiff wrote for publication exposing violations of the NY Humane Alternatives to Long Term Solitary Confinement Act ("HALT Act") by Attica.  They then retaliated for it by sending a copy of it to NYS Office of Mental Health staff at the facility with a fictitious "suicide alert" notice, a common form of retaliation in DOCCS prisons that, if successful, results in OMH staff moving the target to an isolation cell with no communication access for "observation" under extremely onerous conditions (24 hour lighting, no property, and only a "suicide smock" to wear without undergarments).  While in this instance the ultimate attempt failed because the OMH staffer who interrogated Plaintiff about his op-ed concluded it did not indicate a present suicide risk, Plaintiff subsequently omitted statements from his outbound electronic correspondence about his personal experience with the effects of isolated confinement out of concern they could

expose him to retaliatory placement in "observation" effectively incommunicado.

35. On or about August 24, 27 and 31 defendants Leonard and Wolcott blocked multiple attempts by Plaintiff to share a copy of a cease-and-desist letter he had addressed to "All DOCCS Employees" demanding they stop interfering with electronic correspondence.  After the second attempt, Leonard and Wolcott remotely deleted the August 24 and 27 messages from the "sent box" in Plaintiff's tablet without notice or any process whatsoever, apparently in an attempt to destroy any record of the message ever having been sent and blocked.

36. On the morning of August 31, 2022 a local TV news segment covered a protest against the HALT Act by prison staff outside Coxsackie Correctional Facility.  The protesters made what Plaintiff viewed as misrepresentations about the HALT Act in an attempt to dishonestly scapegoat it for prison violence.  He wrote an op-ed in response debunking the protesters' claims and suggesting ways to reduce prison violence, and sent it in outbound correspondence for publication -- only to have Leonard and Wolcott block it.

37. Most of Leonard's and Wolcott's interference with Plaintiff's inbound and outbound electronic correspondence has been done as "shadow blocks" without any notice or reasons given to Plaintiff or anyone else.  On the few occasions that a notice that correspondence was "censored" has been given, the "reasons" bore no connnection whatsoever to reality:

A.   Two simply said "DOCCS Policy: Concerns plans for activities which violate DOCCS policies."

B.   One said "Violent Conduct: Concerns conduct which is forceful, threatening, or violent."

C.   One said "Blackmail-Extortion: Concerns blackmail or extortion."

D.   One said "Destructive Devices: Concerns the manufacture of weapons, explosives/destructive devices, or poison."

Moreover, none of the notices identified which message had been "censored," and the "comments" field in every notice was blank.

38. All told, from May to August alone dealing only with Plaintiff, the defendants blocked inbound and outbound electronic correspondence about litigation against DOCCS, religious freedom violations being caused by a new and controversial policy, a report about illegal segregated confinement, an opinion piece on how prisons can be made safer for incarcerated people and staff, and multiple attempts to share a copy of a cease-and-desist letter that explained constitutional rights relating to electronic correspondence.  In most cases no notice or reasons of any kind has been given, and in the few instances where it has been the asserted "reasons" range from impenetrably generic to facially preposterous.

39. Other incarcerated people throughout DOCCS facilities have experienced similar arbitrary and discriminatory censorship of electronic correspondence regarding, among other things, racial justice issues, prison covid-19 protocols, excessive force and other misconduct by staff, educational content, news publications, and simple day-to-day family communications.

40. No prior action has been brought relating to the claims herein.

41. Plaintiff has exhausted all "available" administrative remedies with respect to the claims made herein and has no complete and adequate remedy at law.


CLAIMS FOR RELIEF

## Claim 1: Free Flow of General Correspondence

42. The defendants' policies and customs, facially and as applied to general (unprivileged) electronic correspondence, violate and have violated Plaintiff's First Amendment right to free flow of general correspondence.

9

## Claim 2: Free Flow of Privileged Correspondence

43. The defendants' policies and customs, facially and as applied to electronic correspondence with attorneys, government oversight agencies, elected officials, the courts, medical professionals, and religious advisors violate and have violated Plaintiff's First, Fourth and Sixth Amendment rights to free flow of privileged correspondence.

## Claim 3: Freedom of the Press

44. The defendants' policies and customs of treating outbound electronic correspondence to bona fide members of the media as unprivileged, facially and as applied to interfere with such correspondence, violate and have violated Plaintiff's rights under the First Amendment's Free Press Clause to communicate with, and author content for publication by, bona fide members of the media.

## Claim 4: Retaliation

45. The defendants' reading of and interference with inbound and outbound electronic correspondence and use of information unlawfully obtained thereby to deter, obstruct, attempt to gain unfair advantages in opposing, and penalize protected activities violate and have violated Plaintiff's First Amendment right to be free from retaliation for protected activities.

## Claim 5: Procedural Due Process

46. The defendants' policies and customs of reading, detaining and destroying inbound and outbound electronic correspondence, with no or inadequate notice, reasons, or opportunity to appeal to a person other than the initial censor, facially and as applied, violate and have violated Plaintiff's Fourteenth Amendment right to procedural due process.

## Claim 6: Substantive Due Process Vagueness

47. The defendants' policies and customs of reading, detaining and destroying inbound and outbound electronic correspondence, facially and as applied, lack meaningful standards, fail to provide notice to incarcerated people and community contacts, and authorize and encourage arbitrary, erratic and discriminatory application and enforcement by officials, in violation of Plaintiff's Fourteenth Amendment right to substantive due process.

## Claim 7: Substantial Overbreadth

47. The defendants' policies and customs of reading, detaining and destroying inbound and outbound electronic correspondence, facially and as applied, are substantially overbroad as they infringe the constitutionally protected correspondence rights of third parties in the same manner and to the same extent as they infringe Plaintiff's, and such infringements are unacceptably numerous in comparison to any lawful applications.

## Claim 8: Unconstitutional Conditions

49. To the extent the defendants contend that access to or use of the electronic correspondence system at issue herein requires, or constitutes, agreement to the policies and customs challenged herein, facially or as applied, such requirement or construction is an unconstitutional condition in violation of the First, Fourth, Sixth and Fourteenth Amendments.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff demands judgment against the defendants:

A.   Declaratory judgment that electronic correspondence is protected by the same substantive standards and procedural requirements that protect

11

conventional physical correspondence, and that the defendants' policies and customs, facially and as applied, are unconstitutional to the extent that they afford less substantive and procedural protections to electronic correspondence;

B.   Preliminary and permanent injunctive relief requiring the defendants to (1) modify the electronic correspondence computer systems and interfaces, and policies and customs related thereto, to remedy the constitutional violations complained of herein; and (2) cease and desist from the unconstitutional practices complained of herein;

C.   Against defendants Annucci, Wolcott and Leonard in their individual capacities and against JPay, an award of nominal, compensatory and/or punitive damages; together with an award of attorney's fees, costs and expenses of prosecuting this action; and

D.   Such other and further relief as is just and proper.

Date: 11/7/2022

JEREMY ZIELINSKI, #16A3601
Plaintiff, Pro Se
Great Meadow Corr. Fac.
P.O. Box 51
Comstock, NY 12821-0051

_____

[1] Exhibit P0002 is referenced before P0001 because the exhibits were numbered based on an earlier draft of this complaint.  Exhibit P0003 is DOCCS Directive #4422, incorporated by reference in DOCCS Directive #4425 (Exhibit P0001).

<u>VERIFICATION</u>

I, JEREMY ZIELINSKI, declare under penalty of perjury pursuant to 28 U.S.C.
§ 1746 that I am the plaintiff herein, that I have read the foregoing Verified
Complaint and know the contents thereof, and that the same is true and correct
to my own knowledge, except as to matters alleged on information and belief and
as to such matters I believe them to be true.


Executed on *November 7,* 2022
at Comstock, New York.

JEREMY ZIELINSKI, #16A3601
Plaintiff, Pro Se
Great Meadow Corr. Fac.
P.O. Box 51
Comstock, NY 12821-0051

13

| NEW YORK STATE | Corrections and Community Supervision | TITLE | | NO. 4425 |
|---|---|---|---|---|
| | | Inmate Tablet Program | | DATE 10/16/2020 |
| | DIRECTIVE | | | |
| SUPERSEDES Dir. #4425, Dtd. 07/30/20 | | DISTRIBUTION A B | PAGES PAGE 1 OF 10 | DATE LAST REVISED |
| REFERENCES (include but are not limited to) NYS Abandoned Property Law, Section 1304; NYS Finance Law, Section 128; 7 NYCRR Part 254; Directives #2798, #4066, #4422, #4572, #4917, #4932 | | APPROVING AUTHORITY Jeff McKelvey | | |

I. **PURPOSE**: This directive contains and describes the policies and procedures governing the tablet program available to all inmates in general population. The utilization of a tablet assigned to an inmate and usage of kiosks must be in accordance with the policies and procedures contained in this directive.

II. **POLICY**: The Department will provide inmates in general population with access to tablets and kiosks for the purpose of providing educational material, for the ability to purchase approved music, videos, e-books, and other media, and for the opportunity to use a secure messaging system to communicate with family and friends as approved by the Department. These connections will be granted through an independent vendor-provided secure network and will not allow access to the Internet.

III. **DEFINITIONS**

A. <u>Content</u>: A selection of applications and materials approved by the Department for use on tablets that are provided to an inmate. There are two categories of content:

　1. <u>Downloadable</u>: A selection of materials that can be added to a tablet, through the kiosk, at an inmate's discretion. This type of content may have costs associated with it, which the inmate will fund through their Kiosk Media account.

　2. <u>Preloaded</u>: A selection of materials that may be included on the tablet upon issuance to the inmate at no cost.

B. <u>E-card</u>: An electronic greeting card image, approved by the Department and sold by the kiosk provider, that can be attached to a secure message.

C. <u>Kiosk</u>: A security-grade unit with a computer and other components that operates on an independent secure network to provide access to secure messaging, preloaded and downloadable content such as music, videos, and e-books, and other services for inmates.

D. <u>Kiosk Account Password</u>: A unique identifier used to log in to a Kiosk account. This includes all passwords associated with a Kiosk account or tablet.

E. <u>Kiosk Service Provider</u>: The company with whom the Department has contracted to provide kiosk services.

F. <u>Kiosk User Account</u>: A user account established by the inmate in order to access kiosk services.

G. <u>Kiosk Media Account</u>: A pre-paid account established with the kiosk service provider for the purpose of funding the purchase of approved content through the kiosk. This account is funded through approved transfers from an inmate's trust account via submission of a disbursement form.

[P0001 :1]

H.  Secure Message:  Electronic, computer-based, written communication(s), up to 6,000 characters, that are sent or received by an inmate or a community member using applications managed by the kiosk service provider.

I.  Secure Messaging Stamp:  An amount of money, set by the Department contract with the kiosk service provider, required to send a secure message or attachment.

J.  Tablet:  An electronic device that will be loaned to each inmate while in general population, at no cost, that contains a variety of applications that can be used in conjunction with the kiosk to access educational material, download and use media content, and draft secure messages.

K.  Videogram:  A 30-second video clip recorded by a community member and sent to an inmate as a secure message.

## IV.  PROCEDURES

### A.  Inmate Kiosk Access

1.  Employees filling out Form #2095, "Daily Safety Checklist," (see Directive #4066, "Facility Safety and Environmental Services Inspections") for areas having kiosk(s) installed, will visually inspect the kiosk(s) and will note any damage or evidence of tampering with the unit, including verification that the tablet sync cable is present and intact.  Any evidence of tampering will be immediately reported to the Watch Commander.

2.  Kiosks will be located in areas determined and approved by the Department that will allow authorized inmates access to the kiosks at designated times, as established by the facility.

3.  To provide equitable kiosk access to all authorized inmates, the frequency and duration of kiosk use will be limited.  Each inmate will be afforded one 15-minute kiosk session per day, unless otherwise determined by the facility for operational reasons or additional accessibility.

4.  Each facility will establish the times during which inmates may access kiosks. Authorized times for kiosk use must be posted in each general population living area.

5.  At least once every 30 days, the tablet must be connected to the kiosk or it will become inoperable.  If the tablet becomes inoperable due to it not being connected to a kiosk, the inmate will be required to connect it to the kiosk in order to make it operable once again.

### B.  Inmate Kiosk Accounts

1.  All inmates may establish a Kiosk account.  Inmates may use kiosk services in general population once they have agreed to the terms and conditions established by the kiosk service provider.

2.  Inmates must only use their personal Kiosk account and may not use another inmate's Kiosk account.  Use of another inmate's Kiosk account may result in discipline.

3.  All inmates using the kiosk will establish a personal kiosk username and password to guard against theft. Inmates are prohibited from sharing their password with other inmates and are responsible for their password safekeeping.

    4.   The Department of Corrections and Community Supervision is not responsible for theft, loss, or costs related to password theft, sharing, or failure to ensure safekeeping.

C.   Inmate Kiosk Use

    1.   Inmates must comply with all Department directives and facility operations manual items regarding kiosk use. Failure to do so may result in suspension of any or all kiosk services and privileges, pursuant to the procedures for implementing the standards of inmate behavior under 7 NYCRR Part 254, Directive #4932, "Chapter V, Standards Behavior & Allowances," and as set forth in Section V-A below.

    2.   All inmate and community member use of the kiosk services is subject to monitoring, recording, and retention, and any records or data resulting from the use of the kiosk services or associated tablet may be provided to law enforcement agencies.

    3.   Inmates are prohibited from using the kiosk to communicate with other inmates, crime victims, those who have an Order of Protection, those who have an established No Contact Order, or those who have objected in writing to such communications.

    4.   The kiosk secure messaging service may be used for legal correspondence; however, the communication will not be protected as legal correspondence and is subject to monitoring, recording, and retention.

    5.   All inmate questions regarding kiosk services must be directed to the kiosk service provider through the tools and contact methods established by the kiosk service provider.

D.   Content

    1.   The contract between the Department and the kiosk service provider establishes what type of preloaded and downloadable content is available and is subject to change from time to time. Content may include music, movies, games, books, Department publications, etc.

    2.   All available content is subject to Department approval by Central Office representatives consistent with the media review process as described in Directive #4572, "Media Review." Content determined to negatively impact facility safety and security, good order, or Department mission and goals will not be approved.

    3.   Inmates do not have a right to access downloadable content.

E.   Tablets

    1.   All inmates will be provided access to a tablet during their period of incarceration with the Department from the kiosk service provider at no cost to the inmate or the Department. Upon release from the Department, or upon transfer out of the Department's custody, the tablet shall be returned to the kiosk service provider.

    2.   Each tablet will come with a clear protective case, a set of earbuds, and a charger that have been reviewed and approved by the Department. Replacement sets of earbuds and a charger may be purchased through the kiosk service provider. Upon issuance, the inmate will sign for the tablet and associated accessories using Form #4425A, "Receipt of Inmate Tablet Program Materials."

3. Inmates may only possess or use the tablet issued to them and are prohibited from lending or giving their assigned tablet to other inmates, which includes sharing passwords and Personal Identification Numbers (PINs).

4. Tablets must only connect to kiosks and shall not be connected to any other device or computer.

5. Inmates may only possess their tablets in their assigned general confinement housing unit, which includes Regional Medical Units, facility infirmaries, separate keeplock units, dependent on disciplinary sanctions, Residential Crisis Treatment Program (RCTP), Therapeutic Transitional Supervision Unit (TTSU), and Intermediate Care Programs (ICP)/Mental Health Units. General confinement tablets will not be allowed in Special Housing Units.

6. An inmate who intentionally damages a tablet and/or kiosk may be responsible for the repair or replacement cost.

7. The Department and the kiosk service provider, in consultation with the Department, reserve the right to deny a tablet to an inmate who has intentionally destroyed or damaged a tablet or kiosk in the past.

8. Tablets that are malfunctioning will be addressed with the kiosk service provider via communication through the kiosk to determine if the tablet needs to be repaired or replaced.

9. General confinements tablets will transfer with the inmate's property as outlined in Department Directive #4917, "Transferring Inmate Property."

10. Upon release, the kiosk service provider will provide a mechanism at no cost to the released inmate or the Department to provide him or her with all purchased games and music. The content purchased is associated with the DIN associated to the inmate at the time of the purchase and will not be available in the event the inmate is returned to the Department under a violation or a new commitment.

11. Use of a tablet is a privilege and may be suspended for abuse, misuse, or other misconduct, pursuant to the procedures for implementing the standards of inmate behavior under 7 NYCRR Part 254, Directive #4932, and as set forth in Section V-A below.

12. Inmates received into custody after the original issuance of the tablets may order a tablet upon being assigned to their first permanent facility as outlined in the following procedure:

    a. Log into their Kiosk account;

    b. Select "Media," then "Purchase Device" (there will be no charge per the contract with NYS); and

    c. Follow the steps to complete the order.

F. Exchanging Tablets and Paid Accessories

1. Individually packaged tablets for Return Merchandise Authorization (RMA) exchange will include:

    a. Tablet; and

    b. Plastic Protective Cover.

2. If the shipment includes RMA devices, the tablet bag will be clearly marked with an RMA sticker. Only use these RMA tablets to complete an RMA exchange.

[P0001:4]

3. Replacement accessories will not be included for replacement devices. The inmate should keep the accessories received with the original tablet.

4. When distributing replacement tablets, staff should collect the previously issued item from the inmate prior to delivering the replacement item. Inmates may possess only one tablet at a time. The shipping manifest will indicate "exchange required: yes" if records indicate the inmate already possesses an active tablet.

   NOTE: If the inmate claims they do not have their previously issued tablet upon exchange, a security supervisor will be notified and an investigation will be conducted to ascertain the whereabouts of the tablet.

5. Accessories requiring an RMA exchange will arrive individually packaged.

G. Returning Tablets and Accessories to JPay

1. Package Room staff will only ship return tablets and/or accessories to JPay once replacement items have been delivered to the inmate.

2. A pre-paid shipping label is automatically included in all shipments which require a tablet exchange.

3. Once a tablet and/or accessory is exchanged, staff will place the previously issued item into a box. When the box is full, staff will affix the pre-paid shipping label provided by JPay on the box and mail the parcel to JPay. A manifest of the items included in the shipment should be included.

H. Transferred Inmates and Inmates Temporarily Absent From the Facility

1. A tablet or accessory received for an inmate who has transferred from the facility will be forwarded by facility Package Room staff to the appropriate facility. All packages will be sent by receipted carrier and all expenses will be borne by the sending facility.

2. A tablet or accessory received for an inmate temporarily absent from the facility (i.e., out to court, outside hospital, etc.) will be secured unopened in the facility Package Room unless it is determined the inmate will be absent in excess of 30 days. Upon approval from the facility Deputy Superintendent for Security (DSS), the item(s) will then be returned to JPay.

I. Opting Out

1. An inmate may choose to opt out of the Inmate Tablet Program at any time, as follows:

   a. Log into their Kiosk account;

   b. Select "Communications Center";

   c. Choose "Opt Out of Inmate Tablet Program";

   d. Select "JPay Support Ticket";

   e. Select "Inmate Tablet Program";

   f. Complete and submit the reason(s) for opting out of the Inmate Tablet Program;

   g. If opting out and the inmate has a tablet, her or she must sign and date Form #4425B, "Inmate Tablet Program Opt Out," and provide the completed form, accompanied by the tablet, the clear protective case, charging cord, and earphones to the Housing Unit Officer, who will provide it to the Package Room; and

h.   The Package Room (mailroom in facilities without a designated Package Room) will use a pre-paid envelope provided by the vendor to return the tablet, the clear protective case, charging cord, and earphones to the vendor.

2.   An inmate who chooses to "opt out" of the Inmate Tablet Program after having a tablet may submit a request, by using the kiosk, for inclusion back into the program after a six-month period, as outlined in the following procedure:

a.   Log into their Kiosk account;

b.   Select "Media," then "Purchase Device" (there will be no charge per the contract with NYS); and

c.   Follow the steps to complete the order.

3.   Inmates who are in the program and opt out, will not be refunded any monies in their Kiosk Media account as indicated in Section IV-M-2.

J.   Secure Messaging

1.   Inmates may only send and receive secure messaging to and from community members who have established an account with the kiosk service provider and have registered that inmate to their account.

2.   Inmates and community members using secure messaging must adhere to all applicable provisions as outlined in Directive #4422, "Inmate Correspondence Program," regarding mail, contraband, and inmate communication.

3.   Inmates may not use secure messaging to communicate with other inmates or individuals who are civilly committed as a dangerous sex offender requiring confinement or are being evaluated for civil management as a detained sex offender.

4.   The cost to send a secure message and associated attachment is outlined in Section VII below. Inmates purchase secure messaging stamps at the kiosk using funds from their Kiosk Media account. Community members purchase secure messaging stamps through the kiosk service provider. Community members may purchase stamps for inmates.

5.   The Department will not print incoming email or attachments for inmates.

K.   Secure Message Screening and Monitoring

1.   All secure messages are subject to content screening by authorized staff.

2.   The Department automatically screens all secure message content. Any secure message which has an attachment(s) may be flagged and held for facility staff review before it can be delivered to its intended recipient. Facility staff at a rank of Lieutenant or above will review such flagged secure messages within five business days.

3.   Secure messages and associated attachments that violate policy will be rejected by the authorized staff at a rank of Lieutenant or above and will not be delivered. Staff will enter the rationale for the rejection in the kiosk provider software. Inmates will be notified of the rejection of outbound secure messages when they log in to the kiosk. Civilian customers will be notified in writing whenever an inbound or outbound message between them and an inmate is rejected.

[P0001:6]

4. The rejection message will be in their secure mail inbox. Stamps will not be refunded to the inmate or community member for the rejected secure message and associated attachments.

5. Staff may issue a disciplinary report for content found within a secure message that is authored by the inmate and is in violation of Departmental policy.

6. The Superintendent may terminate or suspend, for a term or indefinitely, secure messaging privileges for any community member, if the Superintendent has reasonable cause to believe that such action is necessary to maintain the safety, security, and good order of the facility.

7. The rejection of secure messages and associated attachments may be appealed in writing to the Superintendent in compliance with Directive #4422.

8. The Department is not responsible for any funds lost as a result of the suspension of accounts for actions found in violation of Department policy as outlined in Section V of this directive.

L. Videograms

1. Community members may send videograms to those who have established accounts with the kiosk service provider.

2. Videograms are screened prior to releasing to the receiving party as outlined in Section IV-K-2 of this directive. Videograms that pose a risk to public safety or that present a threat to the safety, security, or good order of the facility will not be released and the sender will be notified in writing.

3. Any videogram that contains material which, if sent to the inmate in printed personal correspondence, would violate the provisions of Directive #4422 shall be denied, will not be released, and the sender will be notified in writing.

4. The Department is not responsible for any funds lost as a result of the suspension of accounts for actions found in violation of Department policy as outlined in Section V of this directive.

M. Funding of Kiosk Media Account

1. Inmates may add money to their Kiosk Media accounts by submitting a disbursement form in accordance with Directive #2798, "Inmate Accounts." Inmates are prohibited from adding money to another inmate's Kiosk Media account.
   Upon receipt, the business office will verify the inmate trust account balance and issue a check to the kiosk service provider. The kiosk service provider will deposit the amount of the check into the Kiosk Media account.

2. Any money deposited in the Kiosk Media account may only be spent on kiosk services and cannot be transferred to another account or refunded at any time, including at the time of release; however, unspent funds will be processed by the kiosk service provider, in accordance with Section 1304 of New York's Abandoned Property Law, Section 128 of New York's Finance Law, and New York State policies and procedures relating thereto.

3. Secure messaging stamps are purchased at the kiosk using funds in the inmate's Kiosk Media account. Community members may purchase secure messaging stamps for inmates through the kiosk service provider and will be available to the inmate for use in the inmate's Kiosk Media account.

4.  Inmates must use the kiosk to check Kiosk Media account balances and receive notice of Kiosk Media account deposits.  Any questions regarding Kiosk Media account balances and transactions must be directed to the kiosk service provider.

## V.  TERMINATION, SUSPENSION OF USE PRIVILEGES

A.  Suspension of Tablet Use Privileges:  A Hearing Officer may impose a loss of tablet privileges for an inmate for violation of this policy or as a disciplinary sanction pursuant to the procedures for implementing the standards of inmate behavior under 7 NYCRR Part 254 and Directive #4932.

B.  Suspension of Secure Message Use Privileges for Community Members

1.  A Superintendent may suspend, for a specific period of time or indefinitely, secure messaging privileges for any community member, if the Superintendent has reasonable cause to believe that such action is necessary to maintain the safety, security, or good order of the facility.

2.  Upon imposing a term of suspension, the Superintendent shall notify the community member in writing of the action utilizing Form #4425C, "Secure Message Suspension Letter for Community Members."  The notice shall contain:

   a.  The reason for the suspension;

   b.  The duration of the suspension;  and

   c.  The right to appeal the decision of the Superintendent and the manner in which to do so, including notification that such an appeal must be made within 60 days of receipt of the notice.

3.  The community member may submit an appeal within 60 days of receipt of the notice of suspension of secure messaging privileges as follows:

   a.  Such appeal shall be addressed to the Deputy Commissioner and Counsel and shall be in writing to:  New York State Department of Corrections and Community Supervision, 1220 Washington Avenue, Albany, NY 12226.  The community member may submit any written material he or she wishes to be considered.

   b.  The Deputy Commissioner & Counsel or designee shall render a written decision within 45 days of receipt of the appeal as follows:

      (1)  The decision shall affirm, reverse, or modify the determination of the Superintendent;  and

      (2)  The decision shall contain a statement of the evidence relied upon and a statement of the reasons therefore.

## VI.  KIOSK SYSTEM MAINTENANCE:  The kiosk service provider is solely responsible for maintaining and repairing the kiosks, tablets, and any associated infrastructure with the exception as outlined in Section IV-E-6.

## VII.  COSTS AND FEES

### A.    Money Transfer

| Amount | Online | Phone |
|---|---|---|
| $2.00 - $9.99 | $1.99 | $2.99 |
| $10.00 - $19.99 | $2.99 | $3.99 |
| $20.00 - $49.99 | $3.99 | $4.99 |
| $50.00 - $300.00 | $5.99 | $6.99 |

| Item | Price |
|---|---|
| MoneyGram:  $0.01 - $2,999.99* | $4.00 |
| Lockbox | Free |

*The maximum MoneyGram transaction amount is subject to current MoneyGram regulations.

### B.    Music and Media

| Time | Price |
|---|---|
| Per JPDS (7-inch) Tablet * | Free |
| Per Song | $1.00 - $2.50 |
| Per Album | $2.00 - $46.00 |
| Games | Free - $7.99 |
| Movie & Movie Rental | $2.00 - $25.00 |
| eBooks/Audio Books | Free - $19.99 |

*JPay will provide a tablet to each eligible inmate for the life of the contract.  JPay reserves the right to deny an inmate a replacement tablet should they willfully damage a tablet. Tablets may be refurbished.  The first time each inmate receives a tablet, they will receive a charger and a set of earbuds.  Replacements are available at an additional cost.

### C.    Replacement Items

| Item | Price |
|---|---|
| Earbuds | $5.00 |
| Charger | $10.00 |

D.   Secure Messaging Services (prices below are for incoming and outgoing messages)

| Item | Price |
|---|---|
| Single Stamp* (per secure message) | $0.33 |
| 10 Stamp Bundle | $3.00 |
| 30 Stamp Bundle | $8.40 |
| 60 Stamp Bundle | $15.00 |
| 100 Stamp Bundle | $23.00 |

*Single stamp purchases available for inmates only.  Stamps purchase up to 6,000 characters.

E.   Secure Messaging Products

| Item | Price |
|---|---|
| Attachment (Picture) | 1 Stamp |
| Attachment (Picture/Card) | 2 Stamps |
| Videograms* | 4 Stamps |

*Videograms can only be sent in by a community member and the price listed is the cost to the community member to send the videogram.

F.   Tablet-Based Education

| Item | Price |
|---|---|
| Inmate and Staff Use of JPay's Lantern | Free |
| KA Lite Video Downloads | Free |

## AGREEMENT

This AGREEMENT made this <u>13th</u> day of <u>June</u>, <u>2017</u> between the NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION (hereinafter referred to as "DOCCS"), with its principal office located at The Harriman State Campus, 1220 Washington Avenue, Albany, New York 12226 and JPay, Inc. (hereinafter "CONTRACTOR"), with its principal office located at 12864 Biscayne Boulevard – Suite 243, Miami, FL  33181 is for the establishment of a "piggyback" contract.

WHEREAS, pursuant to New York Correction Law §112(1), the Commissioner of DOCCS is given the authority to contract with private entities for the performance of such functions deemed necessary or desirable to promote the efficient operation of DOCCS, as well as the fulfillment of all lawful responsibilities of DOCCS; and

WHEREAS, the State of Nevada, on behalf of the National Association of State Procurement Officials (NASPO) as well as the Multi-State Corrections Procurement Alliance completed and open and competitive solicitation and awarded a multi-year contract to JPay, Inc. for inmate kiosks and related services ("Originating Contract"), RFP/Contract #1901.

WHEREAS, the Originating Contract authorizes other participating states or correctional agencies, to purchase services off of the Originating Contract in accordance with the terms and provisions described therein; and

WHEREAS, the CONTRACTOR is available under the aforementioned contract to provide Inmate Kiosks and Services; and

WHEREAS, the New York State Office of General Services (OGS) Procurement Services Group has approved the use of the Originating Contract, and

1

[P0002:1]

NOW THEREFORE, in consideration of the promises, responsibilities and covenants herein, the STATE and the CONTRACTOR agree as follows:

## I.   TERM

A.   When signed by the parties and approved by all necessary government agencies, this AGREEMENT shall commence August 1, 2017 to July 31, 2022 ("Term") unless terminated earlier pursuant to its terms.

## II.   AMENDMENTS

A.   This AGREEMENT may be amended only upon the mutual written agreement of the parties.

B.   To modify the AGREEMENT within an existing Term or Renewal Term, the parties shall execute an amendment to the agreement.  Any change in the amount of consideration to be paid, change in scope, or change in the term, is subject to the approval of the Office of the State Comptroller.

C.   Any such amendment to or extension of this AGREEMENT shall be subject to approval by the Office of the State Comptroller ("OSC") and where necessary as set forth in Section X(A) below, shall contain a new budget.

## III.   SUBCONTRACTING

A.   The CONTRACTOR agrees not to subcontract any of its services, unless as indicated in its proposal, without the prior written approval of the DOCCS.  Approval shall not be unreasonably withheld upon receipt of written request to subcontract.

The CONTRACTOR may arrange for a portion/s of its responsibilities under this AGREEMENT to be subcontracted to qualified, responsible subcontractors, subject to approval of the DOCCS. If the CONTRACTOR determines to subcontract a portion of the services, the subcontractors must be clearly identified and the nature and extent of its involvement in and/or proposed performance under this AGREEMENT must be fully explained by the CONTRACTOR to the DOCCS. As part of this explanation, the subcontractor

2

[P0002:2]

must submit to the DOCCS a completed Vendor Assurance of No Conflict of Interest or Detrimental Effect form, as required by the CONTRACTOR prior to execution of this AGREEMENT.

The CONTRACTOR retains ultimate responsibility for all services performed under the AGREEMENT.

All subcontracts shall be in writing and shall contain provisions, which are functionally identical to, and consistent with, the provisions of this AGREEMENT including, but not limited to, the body of this AGREEMENT, and Appendix A – Standard Clauses for New York State Contracts.  Unless waived in writing by the DOCCS, all subcontracts between the CONTRACTOR and subcontractors shall expressly name the STATE, through DOCCS, as the sole intended third party beneficiary of such subcontract.  DOCCS reserves the right to review and approve or reject any subcontract, as well as any amendment to said subcontract(s), and this right shall not make the DOCCS or the STATE a party to any subcontract or create any right, claim, or interest in the subcontractor or proposed subcontractor against the DOCCS.

DOCCS reserves the right, at any time during the term of the AGREEMENT, to verify that the written subcontract between the CONTRACTOR and subcontractors is in compliance with all of the provisions of this Section and any subcontract provisions contained in this AGREEMENT.

The CONTRACTOR shall give the DOCCS immediate notice in writing of the initiation of any legal action or suit which relates in any way to a subcontract with a subcontractor or which may affect the performance of the CONTRACTOR's duties under the AGREEMENT. Any subcontract shall not relieve the CONTRACTOR in any way of any responsibility, duty and/or obligation of the AGREEMENT.

If at any time during performance under this AGREEMENT total compensation to a subcontractor exceeds or is expected to exceed $100,000, that subcontractor shall be required to submit and certify a Vendor Responsibility Questionnaire.

## IV.   TERMINATION

A.     DOCCS shall have the right to terminate this AGREEMENT early for (i) unavailability of funds or (ii) convenience provided that the DOCCS has given written notice to the CONTRACTOR no later than thirty (30) days or more prior to the date of termination.

B.     DOCCS may terminate the AGREEMENT for cause immediately upon written notice of termination to the CONTRACTOR, if the CONTRACTOR fails to comply with the terms and conditions of this AGREEMENT and/or with any laws, rules, regulations, policies or procedures affecting this AGREEMENT.

C.     DOCCS may terminate this AGREEMENT without cause by thirty (30) days prior written notice.  In the event of such termination, the parties will adjust the accrued amount due and the CONTRACTOR will undertake no additional expenditures not already required.

D.     This AGREEMENT may be terminated at any time upon mutual written consent of DOCCS and the CONTRACTOR.

E.     DOCCS reserves the right to terminate this AGREEMENT in the event it is found that the certification filed by the CONTRACTOR in accordance with New York State Finance Law Sections 139-j and 139-k was intentionally false or intentionally incomplete.  Upon such finding, DOCCS may exercise its termination right by providing written notification to the CONTRACTOR in accordance with the written notification terms of this AGREEMENT.

F.     In the event of the termination of this AGREEMENT by either party, DOCCS shall be liable for the actual and necessary expenses for services provided by CONTRACTOR up to and including the effective date of termination.

4

## V.    CONTRACTOR RESPONSIBILITY

A.    The CONTRACTOR shall, at all times during the AGREEMENT term remain responsible.  The CONTRACTOR agrees, if requested by the Commissioner of DOCCS or his designee, to present evidence of its continuing legal authority to do business in New York State, integrity, experience, ability, prior performance, and organizational and financial capacity.

B.    The Commissioner of DOCCS or his designee, in his sole discretion, reserves the right to suspend any or all activities under this AGREEMENT, at any time, when he discovers information that calls into question the responsibility of the CONTRACTOR.  In the event of such suspension, the CONTRACTOR will be given written notice outlining the particulars of such suspension.  Upon issuance of such notice, the CONTRACTOR must comply with the terms of the suspension order.  Contract activity may resume at such time as the Commissioner of DOCCS or his designee issues a written notice authorizing a resumption of performance under the Contract.

C.    Upon written notice to the CONTRACTOR, and a reasonable opportunity to be heard with appropriate DOCCS officials or staff, the AGREEMENT may be terminated by the Commissioner of DOCCS or his designee at the CONTRACTOR'S expense where the CONTRACTOR is determined by the DOCCS Commissioner or his designee to be non-responsible.  In such event, the Commissioner or his designee may complete the contractual requirements in any manner he may deem advisable and pursue available legal or equitable remedies for breach.

## VI.   CONFLICTS OF INTEREST

A.    The CONTRACTOR has provided a form (Vendor Assurance of No Conflict of Interest or Detrimental Effect), signed by an authorized executive or legal representative attesting that the CONTRACTOR's performance of the services does not and will not create a conflict of interest with, nor position the CONTRACTOR to breach any other contract currently in force with the State of

5

[P0002:5]

New York, that the CONTRACTOR will not act in any manner that is detrimental to any STATE project on which the CONTRACTOR is rendering services.

B.     The CONTRACTOR hereby reaffirms the attestations made in its proposal and covenants and represents that there is and shall be no actual or potential conflict of interest that could prevent the CONTRACTOR's satisfactory or ethical performance of duties required to be performed pursuant to the terms of this AGREEMENT. The CONTRACTOR shall have a duty to notify the AGENCY immediately of any actual or potential conflicts of interest.

C.     In conjunction with any subcontract under this AGREEMENT, the CONTRACTOR shall obtain and deliver to the AGENCY, prior to entering into a subcontract, a Vendor Assurance of No Conflict of Interest or Detrimental Effect form, signed by an authorized executive or legal representative of the subcontractor. The CONTRACTOR shall also require in any subcontracting agreement that the subcontractor, in conjunction with any further subcontracting agreement, obtain and deliver to the AGENCY a signed and completed Vendor Assurance of No Conflict of Interest or Detrimental Effect form for each of its subcontractors prior to entering into a subcontract.

D.     The AGENCY and the CONTRACTOR recognize that conflicts may occur in the future because the CONTRACTOR may have existing, or establish new, relationships. The AGENCY will review the nature of any relationships and reserves the right to terminate this AGREEMENT for any reason, or for cause, if, in the judgment of the AGENCY, a real or potential conflict of interest cannot be cured.

VII.   **PUBLIC OFFICERS LAW**

A.     Contractors, consultants, vendors, and subcontractors may hire former State Agency or Authority employees. However, as a general rule and in accordance with New York Public Officers Law, former employees of the State Agency or Authority may neither appear nor practice before the State Agency or

6

Authority, nor receive compensation for services rendered on a matter before the State Agency or Authority, for a period of two years following their separation from State Agency or Authority service. In addition, former State Agency or Authority employees are subject to a "lifetime bar" from appearing before the State Agency or Authority or receiving compensation for services regarding any transaction in which they personally participated or which was under their active consideration during their tenure with the State Agency or Authority.

## VIII.   ETHICS REQUIREMENTS

A.      The Contractor and its Subcontractors shall not engage any person who is, or has been at any time, in the employ of the State to perform services in violation of the provisions of the New York Public Officers Law, other laws applicable to the service of State employees, and the rules, regulations, opinions, guidelines or policies promulgated or issued by the New York State Joint Commission on Public Ethics, or its predecessors (collectively, the "Ethics Requirements"). The Contractor certifies that all of its employees and those of its Subcontractors who are former employees of the State and who are assigned to perform services under this Contract shall be assigned in accordance with all Ethics Requirements. During the Term, no person who is employed by the Contractor or its Subcontractors and who is disqualified from providing services under this Contract pursuant to any Ethics Requirements may share in any net revenues of the Contractor or its Subcontractors derived from this Contract. The Contractor shall identify and provide the State with notice of those employees of the Contractor and its Subcontractors who are former employees of the State that will be assigned to perform services under this Contract, and make sure that such employees comply with all applicable laws and prohibitions. The State may request that the Contractor provide it with whatever information the State deems appropriate about each such person's engagement, work cooperatively with the State to solicit advice from the New York State Joint Commission on Public Ethics, and, if deemed appropriate by the State, instruct any such person to seek the opinion of the New York State Joint Commission on Public Ethics. The State shall have the right to withdraw or withhold approval of any Subcontractor if utilizing such Subcontractor for any work performed hereunder would be in conflict with any of the Ethics Requirements. The

7

State shall have the right to terminate this Contract at any time if any work performed hereunder is in conflict with any of the Ethics Requirements.

## IX.    REQUEST FOR PROPOSAL (RFP) AND CONTRACT AWARD

A.    Request for Proposal (RFP) #1901 was issued by the State of Nevada, on behalf of the National Association of State Procurement Officials (NASPO) as well as the Multi-State Corrections Procurement Alliance, and completed and open and competitive solicitation and awarded a multi-year contract to JPay, Inc. for inmate kiosks and related services ("Originating Contract"), RFP/Contract #1901.

B.    DOCCS has determined that CONTRACTOR is the successful vendor and the CONTRACTOR is willing and able to provide the services required.

C.    CONTRACTOR shall provide kiosks and related services to DOCCS in accordance with the Statement of Work, a true copy of which is annexed hereto and made a part hereof as Appendix B; and the Originating Contract, RFP/Contract #1901 including amendments, a true copy of which is annexed hereto and made a part of as Appendix D.

## X.    STATEMENT OF WORK

A.    Pursuant to this AGREEMENT, CONTRACTOR shall provide the services set forth herein and in Appendix B, Statement of Work, contains a description of the services to be provided by CONTRACTOR.

B.    It is expressly understood and agreed by CONTRACTOR that any and all services and products specified in this AGREEMENT shall be provided only at the direction of DOCCS.

## XI.    COMPENSATION

A.    All compensation that will be paid to the CONTRACTOR is set forth in Exhibit A contained in Appendix B which is attached hereto and made a part hereof.  Page 6 through 8 of Appendix B consists of the Pricing Exhibit.

[P0002:8]

B.    Throughout the term of this AGREEMENT, CONTRACTOR shall be reimbursed only for actual and necessary expenses for services actually performed in accordance with this AGREEMENT and with Appendix B.

## XII.    CONFIDENTIALITY

A.    CONTRACTOR acknowledges that any and all information, records, files, documents or reports contained in any media format (e.g. print, electronic) provided to CONTRACTOR by the DOCCS or otherwise encountered by CONTRACTOR in the provision of services pursuant to this AGREEMENT shall be considered confidential and shall be handled accordingly at all times.  Neither CONTRACTOR nor any of its employees, servants, subcontractors, agents or volunteers shall at any time be permitted to utilize any such confidential information for any purpose outside the scope of this AGREEMENT without the express prior written authorization of DOCCS.  CONTRACTOR shall educate, monitor and be responsible for its employees, servants, subcontractors, agents and volunteers providing services for CONTRACTOR pursuant to this AGREEMENT concerning these confidentiality requirements.  Any breach of the confidentiality requirements set forth in this Section or in Appendix B by CONTRACTOR or by any of its employees, servants, subcontractors, agents or volunteers may result in the immediate termination of this AGREEMENT by the DOCCS and may subject the CONTRACTOR to further penalties.  Annexed hereto as Appendix E is a copy of the Non-Disclosure Agreement.

## XIII.    INDEPENDENT CONTRACTOR

A.    It is expressly understood and agreed that CONTRACTOR'S status hereunder is that of an independent contractor and that no official, employee, servant, subcontractor, agent or volunteer of CONTRACTOR is an employee of the DOCCS or the State of New York.  CONTRACTOR is solely responsible for the work, compensation, benefits and personal conduct of all such persons assigned to the provision of services pursuant to this AGREEMENT.  Nothing contained in this Section or in any other provision of this AGREEMENT shall be construed to impose any liability or duty to the DOCCS or the State of New York

9

[P0002:9]

to persons, firms, consultants or corporations employed or engaged or otherwise utilized by the CONTRACTOR, either directly or indirectly, in any capacity whatsoever, nor shall the DOCCS or the State of New York be liable for any acts, omissions, obligations and taxes of any nature, including unemployment insurance and worker's compensation, of CONTRACTOR or any of its officials, employees, servants, subcontractors, agents or volunteers.

## XIV.   ASSIGNMENT

A.      The rights and obligations of CONTRACTOR under this AGREEMENT may not be assigned, conveyed, transferred, or subcontracted by CONTRACTOR without prior written authorization of the DOCCS as set forth in Appendix A.

## XV.   NOTICES

A.      All notices and communications made pursuant to this AGREEMENT shall be in writing and shall be delivered to the addresses set forth below or to such addresses as the parties may from time to time provide to each other.  Said notices should be served via registered mail or personally.

Notification to DOCCS:          NYS DOCCS
                                Contract Procurement Unit
                                The Harriman State Campus
                                1220 Washington Avenue
                                Albany, New York 12226


Notification to CONTRACTOR:     JPay, Inc.
                                Attn:  Greg Levine
                                12864 Biscayne Boulevard – Suite 243
                                Miami, FL  33181

or any other address as may be hereinafter designated by written notice.  No notice shall be effective until received by the addressee.  Communications concerning the daily functions and operation of the scope of services are not to be considered

10

[P0002:10]

as notices.  Thus, such communications may be done via telephone, e-mail, fax, United States Postal Service or other means.

## X.   MISCELLANEOUS PROVISIONS

A. <u>Entire Agreement:</u>  This AGREEMENT, including the face page and all its appendices, constitutes the entire AGREEMENT between the parties and supersedes all other communications between the parties relating to the subject matter herein.

B. <u>Appendix A:</u>  DOCCS Appendix A (Standard Clauses as required by the Attorney General for all State contracts) is attached hereto and made a part hereof.

C. <u>Controlling Statutes:</u>  This AGREEMENT shall be governed by and construed in accordance with the laws of the State of New York.

D. <u>Order of Precedence:</u>  In the event of any conflict between the terms of this Agreement and the terms of it Appendices, the following order of precedence shall apply:

      I. Appendix A (Standard Clauses)

      II. Agreement #C161422

      III. Appendix B (Statement of Work)

      IV. Appendix D (Originating Contract, RFP/Contract #1901 and amendments)

      V. Appendix C (MWBE & EEO Information)

      VI. Appendix E (Non-Disclosure Agreement)

***"Above Revision Agreed to and Accepted"***

_____, 6/26/17    SLD , 6|27|17
**Contractor Initial / Date**      **DOCCS Initial / Date**

E. <u>Unenforceability:</u> If any part of this AGREEMENT is found to be unenforceable for any reason, that part shall be deemed deleted and all other terms, conditions, and provisions of this AGREEMENT shall remain in full force and effect.

11

define, limit or describe the scope or intent of this AGREEMENT, or any provision thereof, or in any way affect this AGREEMENT.

G. <u>Defense and Indemnification:</u> The contractor shall provide for the complete defense of the State, the Department, its officials, employees, and agents and for their complete indemnification from judgments, settlements, or losses that result from actions, claims, or proceedings both judicial or administrative, that arise out of the contractor's performance of this contract. The contractor's duty to indemnify shall not be lessened by its utilization of subcontractors and shall cover direct, indirect, special and consequential damages.

H. <u>Force Majeure:</u> Neither party shall be liable for losses, defaults, or damages, under this AGREEMENT which result from delays in performing, or inability to perform, all or any of the obligations or responsibilities imposed upon it pursuant to the terms and conditions of this AGREEMENT, due to or because of acts of God, the public enemy, acts of government, earthquakes, floods, strikes, typhoons, civil strife, fire or any cause beyond the reasonable control of the party that was so delayed in performing or so unable to perform, provided that such party was not negligent and shall have used reasonable efforts to avoid and overcome such cause. Such party will resume full performance of such obligations and responsibilities promptly upon removal of any such cause.

I. <u>Certificate of Insurance:</u> CONTRACTOR must have the necessary insurance to comply with New York State requirements.
Prior to providing any service to the State of New York, the bidder must provide a copy of the insurance certificate naming the State of New York and New York State Department of Corrections and Community Supervision as "additional named insured" in its liability policy.

J. <u>Workers' Compensation And Disability Benefits Coverage:</u> A policy covering the obligations of the CONTRACTOR in accordance with the provisions of Chapter 41, Laws of 1914, as amended, known as the Workers' Compensation Law, and the contract, shall be void, and of no effect unless the CONTRACTOR

[P0002:12]

procures such policy, and maintains it through the end of the contract term.  A copy of the certificates must submitted to and retained by DOCCS.  The name and FEIN of the contracting entity must be identical to the name and FEIN identified on the proof of coverage or exemption.  In the instance of exemption, please be advised that the WCB does not verify Attestations for Exemption. It is incumbent on the state contracting entity to verify the validity of the entity's reason for exemption; please verify and provide a copy of the signed and dated exemption certificate.

K.  <u>Non-sectarian:</u> CONTRACTOR is a non-sectarian organization and does not have as one of its purposes the advancement of any religion.

L.  <u>McBride:</u> CONTRACTOR has no business operations in Northern Ireland.

M.  <u>Strict Adherence:</u> The failure of DOCCS to insist upon strict adherence to any provision, fiscal obligation, reporting or other requirement of this AGREEMENT shall not be considered to constitute a waiver or constructive modification to deprive DOCCS of the right to insist upon strict adherence to the terms of this AGREEMENT in the future.

N.  <u>Approval:</u>   This AGREEMENT shall not become effective unless and until approved by the Department of Law (Attorney General) and the Office of the State Comptroller.

O.  <u>Prevailing Wage Rates – Public Works and Building Services Contracts</u>:  Work being performed is subject to prevailing wage rate provisions of New York State Labor Law.  If you have any questions or to obtain Prevailing Wage Rates please contact the New York State Department of Labor, Bureau of Public Works at www.labor.ny.gov

P.  <u>M/WBE:</u>  By signing said AGREEMENT, CONTRACTOR agrees to comply with all requirements of Minority and Women Business Enterprise Laws,

Regulations and Rules (M/WBE) Annexed hereto as Appendix C is a copy of the M/WBE policy.

# **APPENDIX A**

## **Standard Clauses as Required by the Attorney General for all State Contracts**

# APPENDIX A

# STANDARD CLAUSES FOR NEW YORK STATE CONTRACTS

## PLEASE RETAIN THIS DOCUMENT
## FOR FUTURE REFERENCE.

January 2014

[P0002:16]

## TABLE OF CONTENTS

                                                                              Page

1.   Executory Clause                                                          3
2.   Non-Assignment Clause                                                     3
3.   Comptroller's Approval                                                    3
4.   Workers' Compensation Benefits                                            3
5.   Non-Discrimination Requirements                                           3
6.   Wage and Hours Provisions                                                 3
7.   Non-Collusive Bidding Certification                                       4
8.   International Boycott Prohibition                                          4
9.   Set-Off Rights                                                            4
10.  Records                                                                   4
11.  Identifying Information and Privacy Notification                          4
12.  Equal Employment Opportunities For Minorities and Women                   4-5
13.  Conflicting Terms                                                         5
14.  Governing Law                                                             5
15.  Late Payment                                                             5
16.  No Arbitration                                                            5
17.  Service of Process                                                        5
18.  Prohibition on Purchase of Tropical Hardwoods                             5-6
19.  MacBride Fair Employment Principles                                       6
20.  Omnibus Procurement Act of 1992                                           6
21.  Reciprocity and Sanctions Provisions                                      6
22.  Compliance with New York State Information Security Breach and Notification Act   6
23.  Compliance with Consultant Disclosure Law                                 6
24.  Procurement Lobbying                                                       7
25.  Certification of Registration to Collect Sales and Compensating Use Tax by Certain   7
     State Contractors, Affiliates and Subcontractors
26.  Iran Divestment Act                                                        7

[P0002:17]

## STANDARD CLAUSES FOR NYS CONTRACTS

The parties to the attached contract, license, lease, amendment or other agreement of any kind (hereinafter, "the contract" or "this contract") agree to be bound by the following clauses which are hereby made a part of the contract (the word "Contractor" herein refers to any party other than the State, whether a contractor, licenser, licensee, lessor, lessee or any other party):

**1. EXECUTORY CLAUSE.** In accordance with Section 41 of the State Finance Law, the State shall have no liability under this contract to the Contractor or to anyone else beyond funds appropriated and available for this contract.

**2. NON-ASSIGNMENT CLAUSE.** In accordance with Section 138 of the State Finance Law, this contract may not be assigned by the Contractor or its right, title or interest therein assigned, transferred, conveyed, sublet or otherwise disposed of without the State's previous written consent, and attempts to do so are null and void. Notwithstanding the foregoing, such prior written consent of an assignment of a contract let pursuant to Article XI of the State Finance Law may be waived at the discretion of the contracting agency and with the concurrence of the State Comptroller where the original contract was subject to the State Comptroller's approval, where the assignment is due to a reorganization, merger or consolidation of the Contractor's business entity or enterprise. The State retains its right to approve an assignment and to require that any Contractor demonstrate its responsibility to do business with the State. The Contractor may, however, assign its right to receive payments without the State's prior written consent unless this contract concerns Certificates of Participation pursuant to Article 5-A of the State Finance Law.

**3. COMPTROLLER'S APPROVAL.** In accordance with Section 112 of the State Finance Law (or, if this contract is with the State University or City University of New York, Section 355 or Section 6218 of the Education Law), if this contract exceeds $50,000 (or the minimum thresholds agreed to by the Office of the State Comptroller for certain S.U.N.Y. and C.U.N.Y. contracts), or if this is an amendment for any amount to a contract which, as so amended, exceeds said statutory amount, or if, by this contract, the State agrees to give something other than money when the value or reasonably estimated value of such consideration exceeds $10,000, it shall not be valid, effective or binding upon the State until it has been approved by the State Comptroller and filed in his office. Comptroller's approval of contracts let by the Office of General Services is required when such contracts exceed $85,000 (State Finance Law Section 163.6-a). However, such pre-approval shall not be required for any contract established as a centralized contract through the Office of General Services or for a purchase order or other transaction issued under such centralized contract.

**4. WORKERS' COMPENSATION BENEFITS.** In accordance with Section 142 of the State Finance Law, this contract shall be void and of no force and effect unless the Contractor shall provide and maintain coverage during the life of this contract for the benefit of such employees as are required to be covered by the provisions of the Workers' Compensation Law.

**5. NON-DISCRIMINATION REQUIREMENTS.** To the extent required by Article 15 of the Executive Law (also known as the Human Rights Law) and all other State and Federal statutory and constitutional non-discrimination provisions, the Contractor will not discriminate against any employee or applicant for employment because of race, creed, color, sex (including gender identity or expression), national origin, sexual orientation, military status, age, disability, predisposing genetic characteristics, marital status or domestic violence victim status. Furthermore, in accordance with Section 220-e of the Labor Law, if this is a contract for the construction, alteration or repair of any public building or public work or for the manufacture, sale or distribution of materials, equipment or supplies, and to the extent that this contract shall be performed within the State of New York, Contractor agrees that neither it nor its subcontractors shall, by reason of race, creed, color, disability, sex, or national origin: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract. If this is a building service contract as defined in Section 230 of the Labor Law, then, in accordance with Section 239 thereof, Contractor agrees that neither it nor its subcontractors shall by reason of race, creed, color, national origin, age, sex or disability: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract. Contractor is subject to fines of $50.00 per person per day for any violation of Section 220-e or Section 239 as well as possible termination of this contract and forfeiture of all moneys due hereunder for a second or subsequent violation.

**6. WAGE AND HOURS PROVISIONS.** If this is a public work contract covered by Article 8 of the Labor Law or a building service contract covered by Article 9 thereof, neither Contractor's employees nor the employees of its subcontractors may be required or permitted to work more than the number of hours or days stated in said statutes, except as otherwise provided in the Labor Law and as set forth in prevailing wage and supplement schedules issued by the State Labor Department. Furthermore, Contractor and its subcontractors must pay at least the prevailing wage rate and pay or provide the prevailing supplements, including the premium rates for overtime pay, as determined by the State Labor Department in accordance with the Labor Law. Additionally, effective April 28, 2008, if this is a public work contract covered by Article 8 of the Labor Law, the Contractor understands and agrees that the filing of payrolls in a manner consistent with Subdivision 3-a of Section 220 of the Labor Law shall be a condition precedent to payment by the State of

[P0002:18]

any State approved sums due and owing for work done upon the project.

**7. NON-COLLUSIVE BIDDING CERTIFICATION.** In accordance with Section 139-d of the State Finance Law, if this contract was awarded based upon the submission of bids, Contractor affirms, under penalty of perjury, that its bid was arrived at independently and without collusion aimed at restricting competition. Contractor further affirms that, at the time Contractor submitted its bid, an authorized and responsible person executed and delivered to the State a non-collusive bidding certification on Contractor's behalf.

**8. INTERNATIONAL BOYCOTT PROHIBITION.** In accordance with Section 220-f of the Labor Law and Section 139-h of the State Finance Law, if this contract exceeds $5,000, the Contractor agrees, as a material condition of the contract, that neither the Contractor nor any substantially owned or affiliated person, firm, partnership or corporation has participated, is participating, or shall participate in an international boycott in violation of the federal Export Administration Act of 1979 (50 USC App. Sections 2401 et seq.) or regulations thereunder. If such Contractor, or any of the aforesaid affiliates of Contractor, is convicted or is otherwise found to have violated said laws or regulations upon the final determination of the United States Commerce Department or any other appropriate agency of the United States subsequent to the contract's execution, such contract, amendment or modification thereto shall be rendered forfeit and void. The Contractor shall so notify the State Comptroller within five (5) business days of such conviction, determination or disposition of appeal (2NYCRR 105.4).

**9. SET-OFF RIGHTS.** The State shall have all of its common law, equitable and statutory rights of set-off. These rights shall include, but not be limited to, the State's option to withhold for the purposes of set-off any moneys due to the Contractor under this contract up to any amounts due and owing to the State with regard to this contract, any other contract with any State department or agency, including any contract for a term commencing prior to the term of this contract, plus any amounts due and owing to the State for any other reason including, without limitation, tax delinquencies, fee delinquencies or monetary penalties relative thereto. The State shall exercise its set-off rights in accordance with normal State practices including, in cases of set-off pursuant to an audit, the finalization of such audit by the State agency, its representatives, or the State Comptroller.

**10. RECORDS.** The Contractor shall establish and maintain complete and accurate books, records, documents, accounts and other evidence directly pertinent to performance under this contract (hereinafter, collectively, "the Records"). The Records must be kept for the balance of the calendar year in which they were made and for six (6) additional years thereafter. The State Comptroller, the Attorney General and any other person or entity authorized to conduct an examination, as well as the agency or agencies involved in this contract, shall have access to the Records during normal business hours at an office of the Contractor within the State of New York or, if no such office is available, at a mutually agreeable and reasonable venue within the State, for the term specified above for the purposes of inspection, auditing and copying. The State shall take reasonable steps to protect from public disclosure any of the Records which are exempt from disclosure under Section 87 of the Public Officers Law (the "Statute") provided that: (i) the Contractor shall timely inform an appropriate State official, in writing, that said records should not be disclosed; and (ii) said records shall be sufficiently identified; and (iii) designation of said records as exempt under the Statute is reasonable. Nothing contained herein shall diminish, or in any way adversely affect, the State's right to discovery in any pending or future litigation.

**11. IDENTIFYING INFORMATION AND PRIVACY NOTIFICATION.** (a) Identification Number(s). Every invoice or New York State Claim for Payment submitted to a New York State agency by a payee, for payment for the sale of goods or services or for transactions (e.g., leases, easements, licenses, etc.) related to real or personal property must include the payee's identification number. The number is any or all of the following: (i) the payee's Federal employer identification number, (ii) the payee's Federal social security number, and/or (iii) the payee's Vendor Identification Number assigned by the Statewide Financial System. Failure to include such number or numbers may delay payment. Where the payee does not have such number or numbers, the payee, on its invoice or Claim for Payment, must give the reason or reasons why the payee does not have such number or numbers.

(b) Privacy Notification. (1) The authority to request the above personal information from a seller of goods or services or a lessor of real or personal property, and the authority to maintain such information, is found in Section 5 of the State Tax Law. Disclosure of this information by the seller or lessor to the State is mandatory. The principal purpose for which the information is collected is to enable the State to identify individuals, businesses and others who have been delinquent in filing tax returns or may have understated their tax liabilities and to generally identify persons affected by the taxes administered by the Commissioner of Taxation and Finance. The information will be used for tax administration purposes and for any other purpose authorized by law. (2) The personal information is requested by the purchasing unit of the agency contracting to purchase the goods or services or lease the real or personal property covered by this contract or lease. The information is maintained in the Statewide Financial System by the Vendor Management Unit within the Bureau of State Expenditures, Office of the State Comptroller, 110 State Street, Albany, New York 12236.

**12. EQUAL EMPLOYMENT OPPORTUNITIES FOR MINORITIES AND WOMEN.** In accordance with Section 312 of the Executive Law and 5 NYCRR 143, if this contract is: (i) a written agreement or purchase order instrument, providing for a total expenditure in excess of $25,000.00,

whereby a contracting agency is committed to expend or does expend funds in return for labor, services, supplies, equipment, materials or any combination of the foregoing, to be performed for, or rendered or furnished to the contracting agency; or (ii) a written agreement in excess of $100,000.00 whereby a contracting agency is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon; or (iii) a written agreement in excess of $100,000.00 whereby the owner of a State assisted housing project is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon for such project, then the following shall apply and by signing this agreement the Contractor certifies and affirms that it is Contractor's equal employment opportunity policy that:

(a) The Contractor will not discriminate against employees or applicants for employment because of race, creed, color, national origin, sex, age, disability or marital status, shall make and document its conscientious and active efforts to employ and utilize minority group members and women in its work force on State contracts and will undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination. Affirmative action shall mean recruitment, employment, job assignment, promotion, upgradings, demotion, transfer, layoff, or termination and rates of pay or other forms of compensation;

(b) at the request of the contracting agency, the Contractor shall request each employment agency, labor union, or authorized representative of workers with which it has a collective bargaining or other agreement or understanding, to furnish a written statement that such employment agency, labor union or representative will not discriminate on the basis of race, creed, color, national origin, sex, age, disability or marital status and that such union or representative will affirmatively cooperate in the implementation of the Contractor's obligations herein; and

(c) the Contractor shall state, in all solicitations or advertisements for employees, that, in the performance of the State contract, all qualified applicants will be afforded equal employment opportunities without discrimination because of race, creed, color, national origin, sex, age, disability or marital status.

Contractor will include the provisions of "a", "b", and "c" above, in every subcontract over $25,000.00 for the construction, demolition, replacement, major repair, renovation, planning or design of real property and improvements thereon (the "Work") except where the Work is for the beneficial use of the Contractor. Section 312 does not apply to: (i) work, goods or services unrelated to this contract; or (ii) employment outside New York State. The State shall consider compliance by a contractor or subcontractor with the requirements of any federal law concerning equal employment

opportunity which effectuates the purpose of this section. The contracting agency shall determine whether the imposition of the requirements of the provisions hereof duplicate or conflict with any such federal law and if such duplication or conflict exists, the contracting agency shall waive the applicability of Section 312 to the extent of such duplication or conflict. Contractor will comply with all duly promulgated and lawful rules and regulations of the Department of Economic Development's Division of Minority and Women's Business Development pertaining hereto.

**13. CONFLICTING TERMS.** In the event of a conflict between the terms of the contract (including any and all attachments thereto and amendments thereof) and the terms of this Appendix A, the terms of this Appendix A shall control.

**14. GOVERNING LAW.** This contract shall be governed by the laws of the State of New York except where the Federal supremacy clause requires otherwise.

**15. LATE PAYMENT.** Timeliness of payment and any interest to be paid to Contractor for late payment shall be governed by Article 11-A of the State Finance Law to the extent required by law.

**16. NO ARBITRATION.** Disputes involving this contract, including the breach or alleged breach thereof, may not be submitted to binding arbitration (except where statutorily authorized), but must, instead, be heard in a court of competent jurisdiction of the State of New York.

**17. SERVICE OF PROCESS.** In addition to the methods of service allowed by the State Civil Practice Law & Rules ("CPLR"), Contractor hereby consents to service of process upon it by registered or certified mail, return receipt requested. Service hereunder shall be complete upon Contractor's actual receipt of process or upon the State's receipt of the return thereof by the United States Postal Service as refused or undeliverable. Contractor must promptly notify the State, in writing, of each and every change of address to which service of process can be made. Service by the State to the last known address shall be sufficient. Contractor will have thirty (30) calendar days after service hereunder is complete in which to respond.

**18. PROHIBITION ON PURCHASE OF TROPICAL HARDWOODS.** The Contractor certifies and warrants that all wood products to be used under this contract award will be in accordance with, but not limited to, the specifications and provisions of Section 165 of the State Finance Law, (Use of Tropical Hardwoods) which prohibits purchase and use of tropical hardwoods, unless specifically exempted, by the State or any governmental agency or political subdivision or public benefit corporation. Qualification for an exemption under this law will be the responsibility of the contractor to establish to meet with the approval of the State.

In addition, when any portion of this contract involving the use of woods, whether supply or installation, is to be performed by any subcontractor, the prime Contractor will indicate and certify in the submitted bid proposal that the subcontractor has been informed and is in compliance with specifications and provisions regarding use of tropical hardwoods as detailed in §165 State Finance Law. Any such use must meet with the approval of the State; otherwise, the bid may not be considered responsive. Under bidder certifications, proof of qualification for exemption will be the responsibility of the Contractor to meet with the approval of the State.

**19. MACBRIDE FAIR EMPLOYMENT PRINCIPLES.** In accordance with the MacBride Fair Employment Principles (Chapter 807 of the Laws of 1992), the Contractor hereby stipulates that the Contractor either (a) has no business operations in Northern Ireland, or (b) shall take lawful steps in good faith to conduct any business operations in Northern Ireland in accordance with the MacBride Fair Employment Principles (as described in Section 165 of the New York State Finance Law), and shall permit independent monitoring of compliance with such principles.

**20. OMNIBUS PROCUREMENT ACT OF 1992.** It is the policy of New York State to maximize opportunities for the participation of New York State business enterprises, including minority and women-owned business enterprises as bidders, subcontractors and suppliers on its procurement contracts.

Information on the availability of New York State subcontractors and suppliers is available from:

NYS Department of Economic Development
Division for Small Business
Albany, New York 12245
Telephone: 518-292-5100
Fax: 518-292-5884
email: opa@esd.ny.gov

A directory of certified minority and women-owned business enterprises is available from:

NYS Department of Economic Development
Division of Minority and Women's Business Development
633 Third Avenue
New York, NY 10017
212-803-2414
email: mwbecertification@esd.ny.gov
https://ny.newnycontracts.com/FrontEnd/VendorSearchPublic.asp

The Omnibus Procurement Act of 1992 requires that by signing this bid proposal or contract, as applicable, Contractors certify that whenever the total bid amount is greater than $1 million:

(a) The Contractor has made reasonable efforts to encourage the participation of New York State Business Enterprises as suppliers and subcontractors, including certified minority and women-owned business enterprises, on this project, and has retained the documentation of these efforts to be provided upon request to the State;

(b) The Contractor has complied with the Federal Equal Opportunity Act of 1972 (P.L. 92-261), as amended;

(c) The Contractor agrees to make reasonable efforts to provide notification to New York State residents of employment opportunities on this project through listing any such positions with the Job Service Division of the New York State Department of Labor, or providing such notification in such manner as is consistent with existing collective bargaining contracts or agreements. The Contractor agrees to document these efforts and to provide said documentation to the State upon request; and

(d) The Contractor acknowledges notice that the State may seek to obtain offset credits from foreign countries as a result of this contract and agrees to cooperate with the State in these efforts.

**21. RECIPROCITY AND SANCTIONS PROVISIONS.** Bidders are hereby notified that if their principal place of business is located in a country, nation, province, state or political subdivision that penalizes New York State vendors, and if the goods or services they offer will be substantially produced or performed outside New York State, the Omnibus Procurement Act 1994 and 2000 amendments (Chapter 684 and Chapter 383, respectively) require that they be denied contracts which they would otherwise obtain. NOTE: As of May 15, 2002, the list of discriminatory jurisdictions subject to this provision includes the states of South Carolina, Alaska, West Virginia, Wyoming, Louisiana and Hawaii. Contact NYS Department of Economic Development for a current list of jurisdictions subject to this provision.

**22. COMPLIANCE WITH NEW YORK STATE INFORMATION SECURITY BREACH AND NOTIFICATION ACT.** Contractor shall comply with the provisions of the New York State Information Security Breach and Notification Act (General Business Law Section 899-aa; State Technology Law Section 208).

**23. COMPLIANCE WITH CONSULTANT DISCLOSURE LAW.** If this is a contract for consulting services, defined for purposes of this requirement to include analysis, evaluation, research, training, data processing, computer programming, engineering, environmental, health, and mental health services, accounting, auditing, paralegal, legal or similar services, then, in accordance with Section 163 (4-g) of the State Finance Law (as amended by Chapter 10 of the Laws of 2006), the Contractor shall timely, accurately and properly comply with the requirement to submit an annual employment report for the contract to the agency that awarded

the contract, the Department of Civil Service and the State Comptroller.

**24. PROCUREMENT LOBBYING.** To the extent this agreement is a "procurement contract" as defined by State Finance Law Sections 139-j and 139-k, by signing this agreement the contractor certifies and affirms that all disclosures made in accordance with State Finance Law Sections 139-j and 139-k are complete, true and accurate. In the event such certification is found to be intentionally false or intentionally incomplete, the State may terminate the agreement by providing written notification to the Contractor in accordance with the terms of the agreement.

**25. CERTIFICATION OF REGISTRATION TO COLLECT SALES AND COMPENSATING USE TAX BY CERTAIN STATE CONTRACTORS, AFFILIATES AND SUBCONTRACTORS.**
To the extent this agreement is a contract as defined by Tax Law Section 5-a, if the contractor fails to make the certification required by Tax Law Section 5-a or if during the term of the contract, the Department of Taxation and Finance or the covered agency, as defined by Tax Law 5-a, discovers that the certification, made under penalty of perjury, is false, then such failure to file or false certification shall be a material breach of this contract and this contract may be terminated, by providing written notification to the Contractor in accordance with the terms of the agreement, if the covered agency determines that such action is in the best interest of the State.

**26. IRAN DIVESTMENT ACT.** By entering into this Agreement, Contractor certifies in accordance with State Finance Law §165-a that it is not on the "Entities Determined to be Non-Responsive Bidders/Offerers pursuant to the New York State Iran Divestment Act of 2012" ("Prohibited Entities List") posted at:
http://www.ogs.ny.gov/about/regs/docs/ListofEntities.pdf

Contractor further certifies that it will not utilize on this Contract any subcontractor that is identified on the Prohibited Entities List. Contractor agrees that should it seek to renew or extend this Contract, it must provide the same certification at the time the Contract is renewed or extended. Contractor also agrees that any proposed Assignee of this Contract will be required to certify that it is not on the Prohibited Entities List before the contract assignment will be approved by the State.

During the term of the Contract, should the state agency receive information that a person (as defined in State Finance Law §165-a) is in violation of the above-referenced certifications, the state agency will review such information and offer the person an opportunity to respond. If the person fails to demonstrate that it has ceased its engagement in the investment activity which is in violation of the Act within 90 days after the determination of such violation, then the state agency shall take such action as may be appropriate and provided for by law, rule, or contract, including, but not

limited to, imposing sanctions, seeking compliance, recovering damages, or declaring the Contractor in default.

The state agency reserves the right to reject any bid, request for assignment, renewal or extension for an entity that appears on the Prohibited Entities List prior to the award, assignment, renewal or extension of a contract, and to pursue a responsibility review with respect to any entity that is awarded a contract and appears on the Prohibited Entities list after contract award.

[P0002:22]

# **APPENDIX B**

## **Statement of Work between DOCCS and JPay, Inc.**

 **Corrections Services**                                        **Statement of Work**

# NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION (NYSDOCCS)

## Project Objectives

This Statement of Work is being made pursuant to the Participating Addendum entered into by the New York State Office of General Services ("NYSOGS") on behalf of the New York State Department of Corrections and Community Supervision ("NYSDOCCS") and JPay Inc. ("JPay") having a termination date of July 31, 2022 (the "Participating Addendum"). Pursuant to the Participating Addendum, JPay will be the provider of money transfer, release debit cards, music downloads, email and related products, media account funding, and all other tablet-based technology services covered in this agreement and outlined in Exhibit A attached hereto. All services mentioned in this SOW are included in JPay's NASPO contract.

## Scope

**I.   *Funding and Media Services (including Release Debit Cards upon release)- JPAY will be the exclusive provider of these services.***

    <u>Funding</u>

       a.   Media Funding Services

          i.   Services will allow inmates the ability to purchase media credits via the kiosk using funds from their inmate trust account. The use of these services will afford the inmate the option to participate in a pay-per-use JPay service. These credits are non-transferable nor refundable at any time, including at the time of release, however, will be processed in accordance with the Section 1304 of New York's Abandoned Property Law, Section 128 of New York's Finance Law and New York State policies and procedures relating thereto (http://www.osc.state.ny.us/ouf/reporters/files/oufhandbook.pdf).

          ii.   Fees are displayed in Exhibit A

       b.   Inmate Trust Account Funding Services

          i.   Money Transfer services for NYSDOCCS will utilize the following:

              1.   Lockbox — NYSDOCCS will publicize the JPay money order PO Box as the exclusive mailing address to send money orders to fund inmate trust accounts. NYSDOCCS will continue to publicize this address and policy/procedure on the NYSDOCCS website.

              2.   The NYSDOCCS will utilize JPay's money transfer rails (including but not limited to via www.JPay.com, facility lockbox, at MoneyGram locations, and via telephone) as methods for Friends / Family to fund an inmate's account.

              3.   JPay will aid in moving money from facility to facility (specific bank accounts) when an inmate is relocated and the facility where the inmate transfers from will issue a check payable in the amount of the funds JPay transfers at the end of each week.

              4.   The NYSDOCCS will have the ability to deposit checks, such as, but not limited to, Government issued, settlement or estate checks, either into the facility lockbox at no cost or deposit directly into the inmate's account.

          ii.   Fees are displayed in Exhibit A

       c.   Release Debit Cards:

          i.   NYSDOCCS will issue JPay Release Debit Cards to released inmates (over the age of 18) as means to disperse funds left on an Inmate's Trust Account at time of release.

 **Corrections Services**

    ii.    JPay and its sponsor bank may impose a minimum load amount should it be deemed necessary. The minimum amount shall not be less than $5.00 or more than $40.00.

    iii.    Release Debit Cards may be used in conjunction with a NYSDOCCS-sponsored work release program with a separate fee structure than what is discussed in Exhibit A.

    iv.    Fees are displayed in Exhibit A

<u>Media (Kiosk and Tablet Services)</u>

NYSDOCCS shall have discretion as to whether it shall agree to utilize any of the following media services at the rates set forth in the Pricing Exhibit (Exhibit A):

    a.    2-Way Email with content scanning – JPay will be the exclusive provider of this service.

        i.    Attachments Available

            1.    Picture (including eCards)

            2.    Video Attachment / VideoGram

        ii.    Printouts of text / pictures at inmate expense

    b.    Video Visitation

    c.    JP5 Tablet

        i.    JPay will provide a JP5S (7inch) tablet for each inmate as directed by NYSDOCCS for the life of the SOW

        ii.    These tablets will be on a "loan" basis for their use while incarcerated; when released the tablet must be returned in working order to JPay.

            1.    JPay will not hold NYSDOCCS liable for damaged tablets; however, JPay will work with NYSDOCCS in recouping costs from an inmate who damages a tablet and/or kiosk with malice.

        iii.    Tablets issued to inmates may be refurbished units.

        iv.    JPay reserves the right to deny a tablet to an inmate who has destroyed or damaged JPay property in the past.  JPay will work with the NYSDOCCS if this occurs.

        v.    JPay will provide a mechanism at no cost to the released inmate or state to provide him/her with all purchased games and music at their release.

        vi.    Each tablet will come with a set of earbuds and charger that have been reviewed and approved by NYSDOCCS.  Replacement pieces can be purchased via the JPay kiosk at prices described in Exhibit A.

    d.    Tablet (Player) Products – Pricing is described in Exhibit A. -- Jpay will be the exclusive provider of these services.

        i.    Music downloads

            •    Single Songs

            •    Full Albums

        ii.    Video downloads (KA Lite Videos)

        iii.    Education (including Lantern and News Store)

        iv.    E-books

        v.    Movie Rentals

        vi.    Games

        vii.    Accessories

        All content that is offered to the inmate population must be reviewed and approved by NYSDOCCS.

    e.    Value-Added Services (these Value-Added Services shall be made available to NYSDOCCS at no additional cost; JPay and NYSDOCCS can discuss them at a later date):

        i.    PREA Reporting

 **Corrections Services**

  ii. Grievances / Information Center for Inmates
  iii. Commissary Ordering via iFrame

### II. *Network and Infrastructure*

In general, JPay requires the following infrastructure available at each location:

1. Internet access, 3MB download/upload bandwidth (Equivalent of 2 bonded T1) or better depending on the number of kiosks at a given site.
2. Network access at each kiosk location via CAT 5 network cabling (cable runs of 100 meters or less). JPay can share existing network infrastructure and can provide appropriate appliances to supplement the facility's network where necessary.
3. For long cable runs, fiber optic cable is necessary. JPay requires two strands of multi-mode fiber. JPay will provide media converters as necessary in cases where the facility makes unused fiber available. JPay can also share existing fiber with the facility through VLAN configuration. JPay can provide appliances to perform this function if necessary.
4. As an alternative, JPay, with NYSDOCCS permission, will be permitted to use Wi-Fi and/or Wi-Max connectivity.
5. Electrical power in the form of a standard outlet is required at each kiosk location.

JPay will, with the approval and guidance of NYSDOCCS, deploy broadband networks, both wired and wireless (if approved), in all agreed upon NYSDOCCS facilities. If NYSDOCCS has any available conduit, dark fiber, or Ethernet cable available, JPay will first use these resources. JPay will provide broadband connectivity and infrastructure at its cost should NYSDOCCS not have broadband or infrastructure available. JPay will install kiosks at a ratio of 1:75 or as needed at agreed upon locations. The final number of kiosks and types of networks will be determined upon mutual agreement of both parties after site tours are complete.

### III. *Technical Integration*

JPay agrees to work with NYSDOCCS (or its designee) in setting up a file integration with the Inmate Management system. JPay agrees that the inmate lookup will be done via Web Services while a file-swap method will be used to transfer actual deposit files. An additional integration with the IMS will be completed allowing inmates to move money directly from their trust account to the JPay Media account. Documents on current file specifications will be made available in a later Exhibit. Neither party will charge a fee for any costs associated with integrating JPay and NYSDOCCS' Inmate Management System.

Relating to Money Transfer, all funds corresponding to each day's payments are remitted to the specified bank via an Automated Clearing House ("ACH") credit each banking day. The ACH is received within 24-48 business (banking) hours and all fund transfers are detailed in batch reports available on JPay's DOC staff interface.

### IV. *Service Level Agreements*

Kiosk and network issues are resolved within the following timeframe: between 4 hours and 4 business days. Resolution may take 4 days or longer is if this issue is considered an exception, i.e. we are waiting on an order for spare parts, we need to repair damaged fiber, clearance delays, escort issues, etc. Some issues require NYSDOCCS assistance, such as power and network failures.

Issue reporting, communications, and resolutions are handled by JPay's Help Desk Team, Field Engineering Team, and NOC (Network Operation Center).

The Help Desk is responsible for technician clearances, scheduling, assistance with mailroom PC's, inquiries from Investigators, Trust Accountants, and other staff.

**Jpay Corrections Services**

Onsite Field Engineers are deployed to resolve hardware, network, and power issues. For all onsite calls, our goal is to have someone on site within 48 hours of the issue being identified and reported. As it is not always possible to have someone onsite within 48 hours, we aim to have someone onsite no later than 4 business days not including the exceptions described above.

The NOC detects prolonged downtime by watching the network and the frequency of inmate logins. The NOC performs remote reboots to resolve the vast majority of kiosk outages on the same day that they're reported. If an issue is not detected by the NOC, it is most likely detected in the inmate support tickets and in the direct communication from the NYSDOCCS staff via email and phone.

As a general rule, Kiosks are much more complicated than inmate phones and JPay fully understands the hyper-sensitivity of having the kiosks up and running as much as possible.

## V. Personnel

JPay agrees to hire a minimum of 2 New York state based Field Engineers to service JPay's kiosks and networks. These Field Engineers will be supported by JPay's 24-hour Network Operations Center. JPay will assign an Account Manager who is available 24-7 who will act as the main point of contact for the contract. The Account Manager will be supported by JPay's Help Desk, so NYSDOCCS staff always have a contact should they need assistance.

## VI. Marketing

For a successful launch, it is imperative that the inmate population, friends and families are well aware of the service and its offerings. Before launching any service, NYSDOCCS will notify the public about the details of the program. The NYSDOCCS website will be updated to include JPay product information, instructions on how to use JPay, and a link to our customized New York State landing page. JPay will work with NYSDOCCS to distribute printed materials.

## VII. Training

JPay will deploy a team that will work with NYSDOCCS' designated point of contact to customize the training deliverables and objectives. Training will generally be conducted using live training, remote training, and content and literature distribution.

Upon turning on the kiosks at each facility, the JPay Account Manager will conduct onsite training with staff and with inmates by doing inmate town hall sessions. This will be coordinated between the Account Manager and NYSDOCCS staff upon each site launch.

JPay may also produce infomercials for the intra circuit TV system in the prisons which must be reviewed and approved by NYSDOCCS.

JPay's inmate ticket team handles inquiries on a daily basis.

Suggested attendees for training sessions *(training sessions are organized by respective roles)*:
1. Superintendent
2. Security Personnel
3. Inmate Accounts / Business Office Personnel
4. Deputy Superintendent
5. Guidance Staff

## VIII. SOW Term

**JPay** Corrections Services

The term of this Statement of Work shall commence on the date of signature by the NYS Office of the State Comptroller and will continue until July 31, 2022.

**SOW APPROVED AND AGREED TO:**

New York State Department of Corrections
and Community Supervision

*Sandra Downey*
(Authorized Signature)

*Sandra Downey*
(Print or Type Name of Signatory)

DIRECTOR OF
BUDGET & FINANCE
(Title)

6/19/17
(Date)


JPay Inc.

(Authorized Signature)

Errol Feldman
(Print or Type Name of Signatory)

CEO
(Title)

6/13/17
(Date)

12864 Biscayne Blvd. Suite 243 | Miami, FL 33181 | www.JPay.com | 954-862-6900

[P0002:28]

5

 **Corrections Services**

**Exhibit A**

## PRICING EXHIBIT

*Money Transfer*

| Amount | Online | Phone | Commission |
|---|---|---|---|
| $0.00 – $20.00 | $3.15 | $4.15 | None |
| $20.01 – $100.00 | $6.15 | $7.15 | None |
| $100.01 – $200.00 | $8.15 | $9.15 | None |
| $200.01 – $300.00 | $10.15 | $11.15 | None |

| Item | Cash | Credit | Commission |
|---|---|---|---|
| MoneyGram: $0.01 – $2,999.99* | $4.00 | N/A | None |
| Lockbox | No Cost | N/A | None |

*The maximum MoneyGram transaction amount is subject to current MoneyGram regulations.

*Music and Media*

| Item | Extended Price | Commission |
|---|---|---|
| Per JP5S (7-inch) Tablet** | $0.00 | None |
| Replacement Earbuds | $5.00 | None |
| Replacement Charger | $10.00 | None |
| Per Song | $1.00 – $2.50 | None |
| Per Album | $2.00 – $46.00 | None |
| Games | Free – $7.99 | None |
| Movie & Movie Rentals | $2.00 – $25.00 | None |
| eBooks / Audio Books | $0.99 – $19.99 | None |

**JPay will provide a tablet to each NYSDOCCS eligible inmate for the life of the contract. JPay reserves the right to deny an inmate a replacement tablet should s/he willfully damage a tablet. Tablets may be refurbished. The first time each inmate receives a tablet, s/he will receive a charger and a set of earbuds. Replacements are available at a cost to the inmate.

 **Corrections Services**

*Email Services (prices below are for incoming and outgoing email)*

| Item | Extended Price | Commission |
|------|---------------|------------|
| Single Stamp*** (per email) | $0.35 | None |
| 10 Stamp Bundle | $3.25 | None |
| 30 Stamp Bundle | $8.50 | None |
| 60 Stamp Bundle | $15.00 | None |

*\*\*\*Single stamp purchase available to inmate only.  Stamps buy up to 5,000 characters.*

*Email Products*

| Item | Extended Price | Commission |
|------|---------------|------------|
| Attachment (Picture) | 1 Stamp | None |
| Attachment (Picture / Card) | 2 Stamps | None |
| VideoGrams | 4 Stamps | None |

*Video Visitation Products*

| Item | Extended Price | Commission |
|------|---------------|------------|
| Video Visitation | $8.99 per 30 minutes | None |

*Tablet Based Education*

| Item | Extended Price | Commission |
|------|---------------|------------|
| Inmate and Staff use of JPay's Lantern | No Cost | None |
| KA Lite Video Downloads | No Cost | None |

| NEW YORK STATE **Corrections and Community Supervision**  **DIRECTIVE** | TITLE **Incarcerated Individual Correspondence Program** | NO. 4422 |
|---|---|---|
| | | DATE 07/28/2021 |

| SUPERSEDES DIR# 4422 Dtd. 09/27/19 | DISTRIBUTION A B | PAGES PAGE 1 OF 14 | DATE LAST REVISED |
|---|---|---|---|
| REFERENCES (include but are not limited to) See Section II | APPROVING AUTHORITY *[signature]* Jeff McKeely | | |

**I.  PURPOSE**: This directive contains and describes the policies and procedures governing the Correspondence Program available to all incarcerated individuals. The exchange of correspondence between an incarcerated individual and another person or business must be in accord with the regulations contained in this directive.

NOTE: For the policies and procedures governing privileged correspondence, see Directive #4421, "Privileged Correspondence." Electronic mail sent and/or received between an incarcerated individual and a member of the general public is addressed in Directive #4425, "Inmate Tablet Program."

**II.  REFERENCES**

- 7 NYCRR, Part 270.2; 7 NYCRR, Part 720
- ACA Expected Practices:
  - 5-ACI-3D-06, 5-ACI-4A-20, 5-ACI-4B-20, 5-ACI-5A-01, 5-ACI-7D-01, 5-ACI-7D-02, 5-ACI-7D-03, 5-ACI-7D-05, 5-ACI-7D-07, 5-ACI7-D-08, 5-ACI-7D-09
  - 2-CO-5D-01
  - 1-ABC-3D-05, 1-ABC-5D-01, 1-ABC-5D-02, 1-ABC-5D-03, 1-ABC-5D-05, 1-ABC-5D-07, 1-ABC-5D-08, 1-ABC-5D-09
- Directives #0008, #2788, #2798, #4015, #4421, #4425, #4572, #4761, #4910, #4910A, #4911, #4913, #4932
- Inmate Rulebook #113.16

**III.  POLICY**

A.  These regulations are specified for staff, incarcerated individuals, and the general public to provide efficient mail service to all concerned.

B.  Correspondents are personally responsible for the contents of their mail. Violation of the regulations governing incarcerated individual correspondence or 7NYCRR, Part 270.2, "Standards of Inmate Behavior," through correspondence will be considered a serious offense and may result in disciplinary proceedings and/or the monitoring of outgoing correspondence for a specified period of time. Incarcerated individuals and all correspondents are advised that sending obscene, threatening, or fraudulent materials through the mail may be a crime under State and Federal laws. The Department will urge prosecution whenever such mail is brought to its attention.

C.  The sending and receiving of mail by incarcerated individuals will be restricted only to the extent necessary to prevent a threat to the safety, security, and good order of the facility or the safety or well-being of any person, and to prevent unsolicited and unwanted mail.

NOTE: Excluding weekends and holidays or emergency situations, incoming and outgoing letters should not be held for more than 48 hours for incarcerated individuals.

D. The Superintendent shall have the overall responsibility for the administration of the Correspondence Program at their facility. Specific responsibilities may be delegated by the Superintendent.

## IV. GENERAL CORRESPONDENCE PROCEDURES

A. <u>General Correspondence</u> is mail between an incarcerated individual and someone other than a person approved for privileged correspondence (see Directive #4421). For the purpose of this directive, outgoing mail purporting to be privileged correspondence will not be considered to be privileged correspondence until it has been placed in the control of the administration for processing.

B. <u>Outgoing Mail</u>

   1. An incarcerated individual may submit correspondence to be sent to any person or business, subject to the conditions and limitations hereunder.

   2. Whenever the recipient of an incarcerated individual's correspondence indicates, in any manner, that they do not wish to receive further correspondence from the incarcerated individual, the Correspondence Unit, Package Room, Deputy Superintendent for Security (DSS), Supervising Offender Rehabilitation Coordinator (SORC), and incarcerated individual shall be notified. <u>Form #3402</u>, "Addition of Name to Negative Correspondence/Telephone List," shall be used for notification. Copies will be filed as noted on <u>Form #3402</u>.

   NOTE: <u>Form #3402</u> needs to be redistributed, by Guidance staff, to the Correspondence Unit and Package Room upon transfer.

   3. Negative Correspondence/Telephone List: Shall contain the name of any person or business that has indicated, in any manner, that further correspondence from the incarcerated individual is not desired. If a request to be removed from an incarcerated individual's Correspondence/Telephone List is received, a confirmation letter in the format of Attachment A shall be sent to the person making the request. If such a person or business indicates, at a later time, that further correspondence is not objectionable, the Superintendent or designee may, but need not, direct the name of the person or business be removed from the Negative Correspondence/Telephone List.

   Upon receipt of a request to be placed on an incarcerated individual's Negative Correspondence/Telephone List, the requester is to be informed of the toll-free telephone number for the Department of Corrections and Community Supervision (DOCCS) Office of Victim Assistance (1-800-783-6059). The requester should also be told that the Office of Victim Assistance is available to explain release notification options and access to Crime Victim Compensation funds; and, when appropriate, to make referrals to support groups or community services such as those assisting victims of domestic violence or sexual assault.

   NOTE: A parent, custodian, or legal guardian of an incarcerated individual's child who requests that the facility prohibit correspondence between the incarcerated individual and the incarcerated individual's child should be informed that their request cannot be granted absent a Court Order; however, if an incarcerated individual violates Department correspondence procedures, correspondence may be limited, as with any other person.

[P0003:2]

4.   No incarcerated individual shall continue to submit mail to be sent to a person or business that currently appears on their Negative Correspondence/Telephone List. Any incarcerated individual who continues to submit mail to be sent to a person or business that currently appears on the Negative Correspondence/Telephone List may be subject to disciplinary action and/or monitoring of outgoing mail for a specified period of time.

5.   No incarcerated individual may correspond with or make telephone calls to any person who is listed on an active Court Order of Protection which prohibits such contacts.  The name of the person(s) will be added to the Negative Correspondence/Telephone List.  Form #3402 will be completed and used for notification.  Copies will be filed as noted on Form #3402.

NOTE:  Form #3402 will be redistributed, by Guidance staff, to the Correspondence Unit and Package Room upon transfer.

6.   Correspondence by an incarcerated individual to the following persons requires the special advance approval indicated:

   a.   Unrelated minor persons under 18 years of age:  Written approval of the minor's parent or legal guardian must be obtained prior to correspondence with an unrelated minor.  The incarcerated individual may address a letter to the parent or legal guardian to obtain such approval.

   b.   Persons under probation or Community Supervision:  Authorization from the Superintendent and the Probation or Parole Officer must be obtained before the incarcerated individual may correspond with a probationer or parolee. Such correspondence will usually be limited to immediate family members.

   c.   Incarcerated Individuals in New York State, Federal, or other correctional facilities:  Authorization from the Superintendents concerned must be obtained before an incarcerated individual may correspond with another incarcerated individual (see Section IV-C for the complete policy and procedure relating to incarcerated individual-to-incarcerated individual correspondence).

   d.   Persons presently or formerly employed by the Department or in a Department facility:  Unless an incarcerated individual is an immediate family member, authorization from the Superintendent must be obtained before an incarcerated individual may correspond with any person who is a present or former employee of the Department or presently or formerly employed in a Department facility, or with any member of such person's household, at their personal or private residence address.

   e.   Victims:  Authorization from the Superintendent must be obtained before an incarcerated individual may correspond with any victim of a crime for which the incarcerated individual has been convicted or is presently under indictment, or with any member of the victim's household who is not an immediate family member of the incarcerated individual.  The name of the person(s) will be added to the Negative Correspondence/Telephone List.  Form #3402 will be completed and used for notification.  Copies will be filed as noted on Form #3402.

NOTE:  Form #3402 will be redistributed, by Guidance staff, to the Correspondence Unit and Package Room upon transfer.

7.   Except for oversize envelopes and parcels, incarcerated individual-to-incarcerated individual correspondence, and correspondence specified in Section III-A-2 of Directive #4421, outgoing correspondence may be sealed by an incarcerated individual.

8.   Oversize correspondence, defined as mail which cannot be enclosed in a standard business envelope, shall be inspected in the presence of the incarcerated individual by a designated security staff person for the presence of contraband. The Superintendent may designate Block, Law Library, Package Room, Correspondence Unit, Legal Mail, Notary Public, or other staff to conduct these inspections. Inspections shall be completed as soon as possible, but not later than 24 hours after the request.

    Legitimate correspondence may be sealed by the incarcerated individual after inspection, and the inspecting staff person shall then sign the back of the envelope or parcel, certifying inspection, and promptly deliver or forward the mail to the Correspondence Unit or Business Office, as appropriate.

9.   Outgoing correspondence, except as specified in Section III-A-2 of Directive #4421, shall not be opened, inspected, or read without express written authorization from the facility Superintendent.

    a.   The Superintendent shall not authorize the opening or inspection of such outgoing mail unless there is a reason to believe that the provisions of this or any directive, incarcerated individual rule, or regulation have been violated; that any applicable State or Federal law has been violated; or that such mail threatens the safety, security, or good order of the facility or the safety or well-being of any person. Such written authorization by the Superintendent shall set forth specific facts forming the basis for the action.

    b.   If, after inspecting the contents of outgoing mail, it is determined that the provisions of a directive, rule or regulation, or State or Federal law have been violated; or that such correspondence threatens the safety, security, or good order of the facility or the safety or well-being of any person; then the correspondence may be confiscated. The incarcerated individual must be informed in writing unless doing so would interfere with an ongoing investigation.

       Where the incarcerated individual has been so notified, they may appeal the action to the Superintendent.

    c.   In accordance with Section III-C, any opening, inspection, or reading of mail shall not cause the mail to be held for more than 48 hours, excluding weekends and holidays or emergency situations.

10.  All outgoing incarcerated individual mail will be stamped with the name and address of the correctional facility from which it is being sent and a postage meter star symbol.

11.  Outgoing mail should include the full address of the person to whom it is addressed. It should include the Name, Address, City, State, and ZIP code. Incarcerated individuals shall not submit correspondence to be sent to a post office box without a specifically identified addressee; the addressee, either a person or a business, shall be clearly identified. An insufficiently addressed envelope shall be opened to ensure that the letter is returned to the originator.

12. An incarcerated individual may use envelopes and writing paper provided by the facility, or personal writing paper.  Any printing on personalized writing paper is limited to the incarcerated individual's commitment name (unless the incarcerated individual's name has been legally changed), Department Identification Number (DIN), and facility address.  Personalized writing paper (not envelopes) may be ordered by the incarcerated individual from a commercial source.

13. It is the responsibility of each incarcerated individual to print or type their return address on the front upper left-hand corner and on the back flap of each outgoing envelope exactly as illustrated below.  The incarcerated individual shall use their commitment name unless it has been legally changed.  Failure to include all return address information in the order indicated may result in the opening and return of the mail to the incarcerated individual.  If the Correspondence Unit is unable to identify the incarcerated individual sender, the mail will be destroyed by the facility.

| Great Meadow Correctional Facility<br><br>Box 51<br><br>Comstock, New York 12821-0051<br><br>John Doremi, 00-A-0000<br><br><br>(Envelope - front - upper left) | New York State<br>Department of Corrections and<br>Community Supervision<br><br>Incarcerated Individual Correspondence Program<br><br>John Doremi, 00-A-0000<br><br><br>(Envelope - back flap - centered) |
| --- | --- |

14. A facility may restrict what appears on the outside of an outgoing envelope.

15. Incarcerated individuals who are unable to read or write may request the assistance of a staff member, volunteer, or another incarcerated individual for correspondence purposes.

16. Incarcerated individuals shall not conduct a mail order or other business while under the custody of the Department.  Superintendents may direct Administrative Services, Program Services, or Security Services Deputies to monitor correspondence patterns and financial accounts to detect any irregularities which would indicate this type of activity.  Violation of this policy by an incarcerated individual may result in disciplinary action and/or the monitoring of outgoing correspondence for a specified period of time.

17. Incarcerated individuals shall not use their correspondence privileges to solicit or otherwise commercially advertise for money, services, or goods.

18. Correspondence privileges shall not be used by an incarcerated individual to engage in any form of gambling or to participate in any lottery, sweepstakes, or chain letter operation.

19. An incarcerated individual may send, at their own expense, a certified or registered letter, and the incarcerated individual will be provided with a return receipt, if requested, after the delivery has been made.

20. An incarcerated individual must request and pay for certified or registered mail service in order to have a valued personal document mailed out from personal property secured by the facility Inmate Records Coordinator (IRC).

Whenever such mail is prepared and sent by the IRC, a copy of the Disbursement Form and postal documentation showing the item has been sent will be filed in that incarcerated individual's personal property folder. If a return receipt has been requested as part of the postal service, it shall go directly to the incarcerated individual.

21. An incarcerated individual shall not include any written material in outgoing mail not specifically intended for the addressee identified on the exterior of the envelope. Likewise, an incarcerated individual shall not include in outgoing mail any written material for an incarcerated individual not specifically identified as the sender on the exterior of the envelope. This practice, sometimes known as "kiting," may be the basis for disciplinary action.

22. Outgoing correspondence that does not comply with this directive will be opened and returned to the incarcerated individual. The Correspondence Unit shall indicate the reason for return.

C. Incarcerated Individual-to-Incarcerated Individual Correspondence

1. Approval for Incarcerated Individual-to-Incarcerated Individual Correspondence: The Superintendent or Chief Administrator at each facility may designate a staff member to process incarcerated individual-to-incarcerated individual correspondence requests. These requests will be investigated by both facilities to determine that the exchange of such correspondence will not create problems relating to the safety, security, or good order of the facilities; or the safety or well-being of any individual before any incarcerated individual-to-incarcerated individual correspondence is authorized. Authorization for such correspondence must come from the involved Superintendents or their designees.

   a. Exception: Only the approval of the Superintendent of the NYS DOCCS facility where an incarcerated individual is housed is required when they request to correspond with incarcerated individuals who are under the custody of the New York City Department of Corrections. This exception is based on the New York City Department of Corrections' policy that permits incarcerated individuals to write to whomever they choose, including other incarcerated individuals.

   b. Restrictions: Incarcerated individuals are only permitted to correspond with immediate family members and codefendants in active cases. For the purposes of this directive, immediate family members are defined as spouses, children, parents, siblings, and grandparents. Other incarcerated individual-to-incarcerated individual correspondence may only be approved in exceptional circumstances. Changes to the incarcerated individual-to-incarcerated individual correspondence lists are permitted only on a quarterly basis at the time of the incarcerated individual's scheduled interview. Photographs of incarcerated individuals should not be included in incarcerated individual-to-incarcerated individual correspondence.

   c. Transfer of Incarcerated Individuals: When an incarcerated individual is transferred, their approval to correspond with other incarcerated individuals will remain in effect. The Guidance staff at the receiving facility will notify their Correspondence Unit of the names of those incarcerated individuals with approvals for incarcerated individual-to-incarcerated individual correspondence.

[P0003:6]

2.  Denials of authorization for incarcerated individual-to-incarcerated individual correspondence shall include a statement of reasons for the denial and shall be placed in both incarcerated individuals' files.  Such denials may be appealed to the Commissioner or designee, in writing, within 30 days.

Authorization to correspond may be withdrawn by the Superintendent in particular cases when it is demonstrated and documented that:

a.  One or both incarcerated individuals have violated facility or Departmental rules or regulations.

b.  The reason for the original approval no longer applies or has been determined to have been erroneous or deceptive.

c.  The safety, security, or good order of a facility is jeopardized.

d.  The safety or well-being of any individual is jeopardized.

Such documentation shall be placed in both incarcerated individuals' files.

3.  Incarcerated individual-to-incarcerated individual correspondence must not be sealed.  If it is sealed, it may be opened and returned to the incarcerated individual sender.

4.  Incarcerated individual-to-incarcerated individual correspondence may be read by the Superintendent or designee of either the sending or receiving facility or both.  No incarcerated individual-to-incarcerated individual correspondence shall be deemed in any way to be privileged correspondence.

5.  There shall be no exchange of funds or packages between incarcerated individuals (see Directive #4761, "Inmate Charitable Contributions and Gifts").

D.  Postage

1.  Purchase/Possession of Stamps

a.  Incarcerated individuals may not receive stamps through the mail or through incarcerated individual packages.*

*NOTE:  A postage-prepaid envelope received within privileged correspondence from a court or an attorney that has been pre-addressed by the court or attorney may be received (subject to inspection by the security staff) and used by the incarcerated individual for the intended return correspondence.

b.  Postage shall be made available by the sale of stamps in the Commissary. Incarcerated Individuals may purchase up to 50 domestic first class stamps for one-ounce letters per Commissary buy.
The maximum number of stamps in any inmate's personal possession should not exceed 50 (see Departmental rule #113.16 of the inmate rulebook).

c.  An incarcerated individual may purchase postage by attaching an IAS Form #2706, "Disbursement Form," to a letter only in the following circumstances:

(1)  The incarcerated individual is newly arrived at a facility, has no stamps, and has not yet had an opportunity for a Commissary buy.

(2)  The incarcerated individual has had Commissary buy privileges suspended and is not eligible for or does not get a special Commissary stamp buy.

    (3) A particular letter or parcel, because of size, weight, special handling, or any other special postal feature requires an unusual amount of postage.

    (4) There are extenuating circumstances which, in the discretion of the Superintendent, warrant processing a Disbursement Form.

    (5) Sufficient funds are available in the incarcerated individual's account.

  d. An incarcerated individual who has lost Commissary privileges shall be able to make a monthly stamp buy of up to 50 domestic first class stamps for one-ounce letters. This special buy shall be offered within 72 hours of the imposition of the penalty and every 30 days thereafter. Incarcerated individuals who have been admitted to a Special Housing Unit (SHU) shall be offered a stamp buy within 72 hours of admission and every 30 days thereafter.

2. Free Postage

  a. Incarcerated individuals may receive some free postage for privileged correspondence (see Directive #4421).

  b. Incarcerated individuals received at reception/classification facilities (except cadre) shall be allotted free postage in an amount equivalent to five domestic first class letters of one-ounce per week for personal correspondence for a period not to exceed four weeks.

  c. Incarcerated individuals may not accumulate, from week to week, credit for unused postage.

3. Advances for Legal Mail Postage: Funds may be advanced to an incarcerated individual for the purpose of sending legal mail in accordance with the procedures detailed in Directive #4421 and Directive #2788, "Collection & Repayment of Inmate Advances & Obligations."

4. Advances for Personal Postage: Funds may be advanced to an incarcerated individual for one domestic first class one-ounce letter per month in the following circumstances:

  a. The incarcerated individual has been confined to SHU for discipline or administrative segregation for 30 days or more and has a zero or negative account balance.

  b. The incarcerated individual has been in keeplock status for 30 days or more, has lost telephone privileges, and has a zero or negative account balance.

  c. The incarcerated individual has lost telephone privileges, has a zero or negative account balance, and has not refused to accept available program assignments.

5. Incarcerated Individual Organizations: Incarcerated individual organizations must pay the postage costs for all of their outgoing mail.

E. <u>Business Mail</u>: All correspondence addressed to a business entity, other than a member of the media, shall be considered business mail and shall be processed as follows:

1. Business mail obligating an incarcerated individual's funds (e.g., requests to an outside vendor for goods or services, etc.) must be accompanied by a signed and approved IAS <u>Form #2706</u> (see Directive #2798, "Inmate Accounts").

2. When processing this business mail, the facility must ensure that the incarcerated individual has sufficient funds.  If sufficient funds are available, a check or money order will be drawn against the incarcerated individual's account and inserted in the envelope as advance payment.

3. Incarcerated individuals are prohibited from using business correspondence to order any items on credit or installment plans and are also prohibited from obligating their funds for anything more than the immediate purchase which is being reviewed.

   For example, incarcerated individuals may not join a club or purchase plan in which items are automatically sent to the facility along with invoices for payment each week, month, etc.  However, incarcerated individuals may make one single initial payment for items which will be delivered over an extended period of time, provided that there is no additional billing for the items being delivered in the future.

4. All business mail, except business mail addressed to the media, will be submitted by the incarcerated individual unsealed.  Such business mail is subject to inspection.

5. All business mail addressed to the media may be submitted by the incarcerated individual sealed.  Such business mail shall not be subject to opening, inspection, or confiscation, except in accordance with the provisions of Section IV-B-9 above.

6. Notwithstanding the above, mail addressed to a box number in care of a media entity shall not be considered to be mail addressed to the media.

F. Collection of Mail: Outgoing incarcerated individual mail shall be collected, from mail boxes placed in convenient locations in the facility, by a correctional employee at least once a day, except Saturdays, Sundays, and State and postal holidays; mail service on Saturdays and State holidays is optional.  At no time shall an incarcerated individual collect the mail.  Collected mail shall be processed and forwarded to a post office at least once a day, except as noted above.

G. Incoming Mail

1. Inspection of Incoming Correspondence

   a. Before opening, incoming mail should be checked to make sure that the addressee can be accurately identified and is currently at the facility.  If the addressee is no longer at the facility, the mail shall be forwarded in accordance with Directive #4015, "Forwarding Inmate Mail."

      All incoming general correspondence must have a clearly identifiable name of sender and return address.  A letter which does not have a return address will not be delivered to the incarcerated individual.  It will be considered contraband and handled accordingly (see Directive #4910, "Control of & Search for Contraband").

   b. All incoming general correspondence will be opened and inspected for cash, checks, money orders, printed or photocopied materials, and/or contraband. The incarcerated individual's presence is not required during the inspection of incoming general correspondence.  (See Directive #4421 for the procedure to be followed for the opening of privileged correspondence.  See Directive #4572, "Media Review," for publications deemed to be unacceptable.)

[P0003:9]

NOTE:  Greeting card size is not to exceed the limitations as listed in Directive #4911, "Packages & Articles Sent or Brought to Facilities" (18"x14" when opened).  Electronic cards are not permitted.

c.   Publications received at the facility which are in a language other than English shall be referred for translation services to the Central Office Director of Education prior to referral to the Facility Media Review Committee (FMRC).

2.   When, in the course of inspection, checks or money orders from a clearly identifiable source are found, they shall be mailed back to the sender, along with the appropriate notification letter and a JPay deposit slip, both documents ENG/SPL, in accordance with the Mailroom Procedures for JPay.

Facilities will continue to process cash received in the mailroom but must send the appropriate notification letter and JPay deposit slip to the sender.  All anonymously received monies will be considered contraband and handled accordingly (see Directive #4910A, "Contraband/Evidence – Handling, Storage, and Disposition").

3.   When, in the course of inspection, printed or photocopied materials are found, the entire contents of such correspondence may be delayed through the Correspondence Unit for up to six days while the materials are subject to media review guidelines (see Directive #4572).

NOTE:  A limit of five pages of printed or photocopied materials (an individual newspaper clipping will be considered one page) may be received within a piece of regular correspondence (except as provided below).  In order to facilitate media review, pages or clippings must not be taped, glued, or pasted together or to other papers.

Not to exceed once every four months, an incarcerated individual may make a written request to the Superintendent to receive in excess of five pages of printed or photocopied legal papers specifically related to the incarcerated individual's current legal matter (e.g., legal brief or trial transcript relating to the incarcerated individual's active case) within a piece of regular correspondence.

The incarcerated individual shall make the request in advance, specifically identifying the legal papers, including the approximate number of pages, and state why they cannot be obtained via the facility Law Library or privileged correspondence (e.g., from a court, attorney, or the New York State Law Library). If approved, the piece of correspondence must be received within 30 days thereafter.  Upon timely receipt, it shall be processed in accordance with this section and shall not be deemed privileged correspondence.

The five-page limit on the printed or photocopied materials shall not apply to incoming mail from any of the entities listed in Section II-B-2 through Section II-B-6 of Directive #4421.

4.   When, in the course of inspection, contraband is found, it shall be removed and given special handling according to type:

a.   Third-party mail:  Defined as correspondence from a party who is not identified as the sender in the return address.  The facility shall return the entire correspondence to the sender with a letter explaining that third-party mail is considered contraband, is against Department rules, and therefore, will not be delivered to the incarcerated individual.

b.   Unauthorized items:  Shall be either returned to the sender at the expense of the incarcerated individual, or otherwise disposed of.  Such will be the choice of the incarcerated individual and accomplished at the incarcerated individual's expense.  An incarcerated individual shall be allowed 30 days to obtain funds to pay the cost of disposing the contraband.  If, after 30 days, the incarcerated individual is unable to pay for the disposal of the contraband, it will be donated or destroyed.

c.   Personal identifying information:  Any material which appears to contain personal identifying information (e.g., social security number, home address, private email address, or home telephone number) belonging to any person who is not a member of the incarcerated individual's immediate family shall be examined.

If the information identifies a present or former employee of the Department or a person presently or formerly employed in a Department facility, or a member of such person's household, it shall be withheld for investigation unless it is determined that the incarcerated individual has authorization from the Superintendent to receive such correspondence, or the personal identifying information pertains to a member of the incarcerated individual's immediate family.

d.   Crime and sentence information on other incarcerated individuals:  Any material which contains crime and sentence information on any other incarcerated individual shall be confiscated and delivered to the Superintendent.

e.   Illegal items (drugs, weapons, etc.):  Shall be forwarded to the Security Office with appropriate chain-of-custody documentation.  When appropriate, the New York State Police or appropriate police agency shall be notified.

f.   Anonymously received money:  Cash, checks, or money orders will be confiscated, labeled, and forwarded to the Fiscal Office for safekeeping.  An investigation will be conducted in an attempt to verify the source.  If, after proper investigation, no source is identified, the monies will be turned over to the State Treasurer as miscellaneous receipts on an OSC Form AC 909-S.

g.   Uniform Commercial Code (UCC) Financing Statement:  Any UCC Article 9 form, including but not limited to, any financing statement (UCC1, UCC1Ad, UCC1AP, UCC3, UCC3Ad, UCC3AP, UCC1CAd), correction statement (UCC5), or information request (UCC11), whether printed, copied, typed, or hand written, or any document concerning a scheme involving an incarcerated individual's "strawman." "House Joint Resolution 192 of 1933," the "Redemptive Process," "Acceptance for Value," or document indicating copyright of an incarcerated individual's name is prohibited absent prior written authorization from the Superintendent.  All such material and any other material contained within the correspondence shall be examined by the Superintendent in consultation with Counsel's Office and may be withheld for investigation.  An incarcerated individual may request authorization from the Superintendent to receive specific materials by providing the Superintendent with specific, legitimate legal reasons why such materials are required.

5. Incoming general correspondence, other than incarcerated individual-to-incarcerated individual letters and incarcerated individual business mail, will not be read unless there is evidence that the correspondence may contain one or more of the following:

a. Plans for sending contraband in or out of the facility.

b. Plans for criminal activity, including escape.

c. Information which, if communicated, would create a clear and present danger to the safety of persons and/or the security and good order of the facility.

6. Written authorization from the facility Superintendent to read incoming correspondence must be placed in the incarcerated individual's file, specifying the reasons such action is considered necessary and whether all mail or certain correspondence shall be read.  Such authorization shall be for a 60-day period subject to renewal by the Superintendent.

The Superintendent shall request documentation from the person recommending inspection to determine that there are sufficient grounds for reading the mail, that the reasons for reading the mail are related to the legitimate interests of safety, security, and order, and that the reading is no more extensive than necessary to further these interests.

In accordance with Section III-C, any opening, inspection, or reading of mail shall not cause the mail to be held for more than 48 hours, excluding weekends, holidays, or emergency situations.

7. When incoming general correspondence is withheld by the designated staff member for any of the above listed reasons, notification shall be sent to the sender and the intended correspondent of the action taken and reasons therefore, unless doing so would interfere with an ongoing investigation.  The sender and incarcerated individual may appeal this action by writing to the Superintendent.

8. Correspondence privileges with a particular person may be withheld as a result of the disposition of a Superintendent's Hearing, where the incarcerated individual has been involved in improper conduct in connection with correspondence with such person.

9. At the Superintendent's discretion, a record of incoming and outgoing mail may be kept by the Correspondence Unit.

10. Mail received at a facility from which an incarcerated individual has been transferred or released shall be handled in accordance with the procedures indicated in Directive #4015.

11. Incarcerated individuals are authorized to retain all of their personal correspondence, subject only to the limitations expressed in Directive #4913, "Inmate Property," and any other applicable rule or regulation.

12. Incoming mail that is deemed to constitute a form of gambling, lottery, sweepstakes, or chain letter operation is prohibited from coming into the facility. Such mail shall be stamped "RETURN TO SENDER" upon entering the facility.

13. When an incarcerated individual's incoming correspondence is stamped "RETURN TO SENDER" or something similar, the Correspondence Unit should take precautions to ensure that the letter is not an attempt to circumvent the Department's incarcerated individual-to-incarcerated individual correspondence procedures.

When such mail is opened to check for contraband, it shall be inspected to determine if it was written by the incarcerated individual to whom it is being "returned."  If it was not written by that incarcerated individual, it shall be withheld.

H.   <u>Distribution of Mail</u>:  Incoming general correspondence will be delivered to incarcerated individuals on normal business days by a correctional employee.  Incarcerated individuals are not permitted to deliver mail to other incarcerated individuals.

If the incoming general correspondence is registered or certified, the incarcerated individual to whom it is addressed shall sign a receipt for such correspondence.  If the incarcerated individual refuses to sign a receipt, the correspondence shall be returned to the postal service marked "Refused."

| Attachment A | | NO. 4422, Inmate Correspondence Program |
|---|---|---|
| | DATE  07/28/2021 | PAGE 14 of 14 |

### Sample Letter
### Facility Letter Head (see Directive #0008, "Use of Department Stationery & Business Cards")


Dear _____:


This is to confirm that you contacted _____, a staff member at this facility, on _____, indicating that you no longer wish to receive correspondence and/or telephone calls from incarcerated individual _____ _____, DIN _____, and you wish to have your name added to the incarcerated individual's Negative Correspondence/Telephone List.


Staff at this facility will make every effort to ensure that your request is honored.


For your information, the toll-free telephone number for the Office of Victim Assistance is 1-800-783-6059.  Staff at that office are available to explain release notification options and access to Crime Victim Compensation funds and, when appropriate, to make referrals to support groups or community services such as those assisting victims of domestic violence or sexual assault.


If the information contained above is incorrect, or if you would like any additional information, please contact the Office of Victim Assistance.


Sincerely,



Superintendent

JEREMY ZIELENSKI
DIN # 16A3601
GREAT MEADOW CORR. FACILITY
P.O. BOX 51
COMSTOCK, N.Y. 12821-0051



RECEIVED
NOV 23 2022
U.S.D.C.
W.P.



**PRIORITY MAIL®**
UNITED STATES POSTAL SERVICE

Visit us at usps.com

Label 107, January 2008

CLERK OF THE COURT
U.S. DISTRICT COURT - SDNY.
300 QUARROPAS STREET
WHITE PLAINS, N.Y. 10601-4150

( LEGAL MAIL )