\UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JEREMY ZIELINSKI,

Plaintiff,

v.

ANTHONY ANNUCCI et al.,

Defendants.

22-CV-954-LJV
DECISION & ORDER

The plaintiff, Jeremy Zielinski, is a prisoner confined at the Attica Correctional Facility ("Attica"). *See* Docket Item 167. Acting pro se, he commenced this action under 42 U.S.C. § 1983 against JPay, LLC ("JPay"), and multiple individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"). Docket Item 2.[1] In the complaint, Zielinski raised a variety of claims relating to the alleged monitoring and censoring of emails sent and received on the tablet computers that JPay and DOCCS provide to inmates housed at DOCCS facilities. *See generally id.* He also challenged DOCCS Directive No. 4425 ("Directive 4425"), the agency directive governing the use of tablet computers by inmates, as being unconstitutional on its face and as applied. *Id.* at 3-4.

[1] Zielinski filed his complaint in the United States District Court for the Southern District of New York. *See* Docket Items 1 and 2. A short time later, the case was transferred to this District because the allegations in the complaint concerned actions taken by the defendants while Zielinski was confined at Attica, making venue improper in the Southern District. Docket Item 7 at 2. Throughout this decision and order, page numbers in docket citations refer to ECF pagination.

After this Court screened the complaint and found that it presented "colorable" claims, both sets of defendants moved to dismiss. Docket Item 20; Docket Item 33. Zielinski then made several motions, including a motion to strike a memorandum in support of one of the motions to dismiss, Docket Item 42, and multiple motions for preliminary injunctions and temporary restraining orders, Docket Item 55; Docket Item 62; Docket Item 77, all of which have been decided. Because of the novel and challenging issues raised in the complaint and those motions, the Court appointed pro bono counsel to represent Zielinski, Docket Item 82, and gave counsel permission to file an amended complaint, *see* Docket Item 103 (granting motion for leave to file an amended complaint). Like the original complaint, the amended complaint named JPay as a defendant as well as several current and former DOCCS employees (the "DOCCS Defendants"). *See* Docket Item 104.[2]

Both JPay and the DOCCS Defendants moved to dismiss the amended complaint. Docket Item 119 and 125. After Zielinski responded, Docket Items 134 and 135, both sets of defendants replied, Docket Items 140 and 141; Zielinski filed a sur-reply, Docket Item 157;[3] both sets of defendants responded to that sur-reply, Docket Items 163 and 164; and the Court heard oral argument on the motions, Docket Item

[2] More specifically, Zielinski sued Anthony Annucci, Daniel F. Martuscello III, Jeff McKoy, Julie Wolcott, Dennis Bradford, A. Torres, David Howard, Betsy Smith, Daniel M. Leonard, and several John Doe defendants. *See* Docket Item 104.

[3] Zielinski's counsel moved for the Court's assistance in scheduling a virtual conference with the facility where Zielinski was housed "to facilitate attorney-client discussions" in drafting a sur-reply. Docket Item 152. Because Zielinski and his attorneys were able to prepare a sur-reply without the Court's assistance in scheduling a conference, that motion is denied without prejudice as moot. If necessary, Zielinski may make similar requests through his attorneys in the future.

166. For the reasons that follow, the motions to dismiss are GRANTED IN PART and DENIED IN PART.[4]

## **BACKGROUND**[5]

Almost ten years ago, DOCCS and JPay entered into a contract to make tablet computers available to inmates housed in DOCCS facilities. Docket Item 104 ¶ 19. Today, "[m]ost of the incarcerated population . . . has tablets, and electronic correspondence is . . . the predominant means of communication" between "the community [and] people incarcerated in DOCCS facilities." *Id.* ¶ 20. Zielinski says that the DOCCS policy implementing the tablet program is unconstitutional and that the

---

[4] While the motions were being briefed, Zielinski wrote to the Court independently of his attorneys to request a temporary restraining order relating to alleged spoliation of evidence and interference with his ability to speak by phone with his attorneys. *See* Docket Item 146. Because that motion was not made by counsel, the Court denies it without prejudice, and Zielinski's attorneys may move for preliminary injunctive relief in light of this decision and order.

[5] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). And the "complaint is . . . deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal quotation marks and alteration omitted)).

The amended complaint attached four DOCCS directives concerning emails and physical mail, as well as the contract between DOCCS and JPay and certain internal grievance records. *See* Docket Items 104-1 to 104-6. For that reason, and because those documents are integral to the amended complaint, the Court considers them in deciding the motions to dismiss. *See Taylor v. Microgenics Corp.*, 2023 WL 1865274, at *1 n.3 (S.D.N.Y. Feb. 9, 2023) (deeming DOCCS directives "integral" to a complaint raising, among other things, claims under section 1983 relating to drug testing program covered by those directives). The following facts therefore are taken from the amended complaint and the exhibits attached to it.

defendants have violated several of his rights by enforcing that policy.[6] The Court therefore begins with an overview of the tablet program and then turns to Zielinski's experience in using one of the tablets.

## I. THE DOCCS TABLET PROGRAM

"In June [] 2017, DOCCS entered [into] a contract with JPay to make tablet computers and related infrastructure available to the incarcerated population for, among other things, electronic correspondence between incarcerated people and contacts in the community." Docket Item 104 ¶ 19. Under the statement of work included in the contract, JPay agreed with DOCCS to provide "email and related products," along with "other tablet-based technology services." Docket Item 104-1 at 25. And as part of the contract, JPay provides each inmate with a tablet "on a 'loan' basis for [an inmate's] use while incarcerated." *See id.* at 26.

The contract between JPay and DOCCS "is administered jointly" by both, "and the email system was designed and is operated by JPay and DOCCS." Docket Item 104 ¶ 21. JPay also provides technical services, including "content scanning" of emails. Docket Item 104-1 at 26. The contract also provided for "[t]echnical [i]ntegration" of the

---

[6] In the original complaint, Zielinski sought to bring a class action on behalf of all similarly situated inmates. Docket Item 2 at 2-3. Because "it is well settled that a class action cannot be maintained by a pro se litigant," *Burrell v. DOCCS*, 655 F. Supp. 3d 112, 134 (N.D.N.Y. 2023), the Court denied Zielinski's "request that this case proceed as a class action," Docket Item 16 at 2.

Now represented by counsel, Zielinski raises class-related allegations in the amended complaint, Docket Item 104 ¶¶ 16-18, and styles this action as "a putative class action," *id.* ¶ 16. Because the motions to dismiss do not address any of the class-related allegations, the Court "decline[s] to address any issues related to class certification." *Mbadiwe v. Amazon.com, Inc.*, 2025 WL 2675937, at *3 n.2 (S.D.N.Y. Sep. 18, 2025) (declining to address class-related issues at motion to dismiss stage when parties' briefs did not address those issues).

"JPay and NYSDOCCS' Inmate Management System," *id.* at 27, with JPay hiring field engineers and assigning an account manager "available 24-7," *id.* at 28. The account manager would be "supported by JPay's Help Desk" and would "conduct onsite training with" DOCCS staff and inmates to help roll out the tablet program. *See id.*

Directive 4425—titled "Incarcerated Individual Tablet Program" provides implementation details for the tablet program and explains how it operates in DOCCS facilities. *See* Docket Item 104-2.[7] Under this directive, inmates can have tablets only "in their assigned general confinement housing unit," not in the Special Housing Units or Residential Rehabilitation Units. *Id.* at 5.

Directive 4425 also provides that "[a]ll secure messages are subject to content screening by authorized staff." *Id.* at 7. And "[a]ny secure message which has an attachment . . . may be flagged and held for facility staff review before it can be delivered to its intended recipient." *Id.* "Facility staff at a rank of [l]ieutenant or above" are to "review such flagged secure messages within five business days." *Id.*

Messages that violate DOCCS policy will not be delivered to the intended recipient. *Id.* at 8. "Staff will enter the rationale for the rejection in the kiosk provider software," and "[i]ncarcerated individuals will be notified of the rejection of outbound secure messages when they log [into] the kiosk." *Id*. "Civilian customers," on the other hand, "will be notified . . . whenever an inbound or outbound message between them

[7] Zielinski notes that DOCCS has promulgated multiple versions of Directive 4425, Docket Item 104 ¶ 22, and the amended complaint attaches both the version that was effective as of October 2020 and the one effective as of November 2022, Docket Items 104-2 and 104-3. There are, nevertheless, "no meaningful differences in the relevant language at issue between the two versions." Docket Item 104 ¶ 22 n.1. Throughout this decision and order, the Court will quote from or cite the more recent version of Directive 4425, Docket Item 104-2.

and an incarcerated individual is rejected." *Id.*[8] Nothing in Directive 4425 appears to provide for inmates to receive notice when an incoming email is rejected. *See generally id.*

Physical mail is treated differently. For example, the relevant directive governing physical mail, DOCCS Directive No. 4422 ("Directive 4422"), provides that "[t]he sending and receiving of mail by incarcerated individuals will be restricted only to the extent necessary to prevent a threat to the safety, security, and good order of the facility or the safety or well-being of any person, and to prevent unsolicited and unwanted mail." Docket Item 104-4 at 2. There is no such provision for electronic mail. *See generally* Docket Item 104-2. Moreover, for physical mail, "incoming and outgoing letters should not be held for more than 48 hours for incarcerated individuals." *See* Docket Item 104-4 at 2.[9] Flagged electronic mail, on the other hand, is to be reviewed by DOCCS personnel "within five business days." Docket Item 104-2 at 7.

There are other differences as well. For example, Directive 4425 does not distinguish between inbound and outbound email, *see* Docket Item 104-2 at 7 (noting that "[a]ll secure messages are subject to content screening"),[10] but incoming and outgoing physical mail are treated very differently under Directive 4422. More

[8] The kiosk is "[a] security-grade unit with a computer . . . that operates on an independent secure network." Docket item 104-2 at 2. A prisoner plugs the tablet into a kiosk to access downloadable media and emails. *See id.*

[9] Mail sent to certain types of individuals—such as unrelated minors, victims, or other incarcerated individuals—must receive "special advance approval." Docket Item 104-4 at 4.

[10] Directive 4425 includes a list of "references" that includes Directive 4422 but not, as discussed below, Directive 4421. *See* Docket Item 104-2 at 2.

specifically, "[o]utgoing correspondence" generally "shall not be opened, inspected, or read without express written authorization from the facility Superintendent," *id.* at 5, while "[a]ll incoming general correspondence will be opened and inspected for cash, checks, money orders, printed or photocopied materials, and/or contraband," *id.* at 10. And if incoming mail is opened, it will typically not be read "unless there is evidence that the correspondence may contain" plans for sending contraband out of the facility, plans for criminal activity, or information that would endanger the safety and good order of the facility. *Id.* at 13. When incoming mail is withheld, notification typically is sent to both the "sender and the intended correspondent" along with the reasons for withholding it. *Id.*

Additionally, unlike Directive 4422, Directive 4425 does not refer to DOCCS Directive No. 4421 ("Directive 4421") governing privileged correspondence.[11] Under Directive 4421, privileged correspondence "is entitled to a greater degree of confidentiality during processing within the facility than [that] accorded [to] general correspondence." Docket Item 104-5 at 2.

What all this means, Zielinski says, is that the defendants have created a system where all email communications are automatically "subject to . . . screening," *see* Docket Item 104-2 at 7; *see also* Docket Item 104 ¶¶ 36-38, and where none of the established protections applied to physical mail—namely, distinguishing between incoming and outgoing mail and providing greater protection to legal mail—govern that

---

[11] Although Directive 4425 generally provides that inmates and outside "community members" using the JPay email system "must adhere" to Directive 4422, *see* Docket Item 104-2 at 7, it does not say that the Directive 4422 *protections* described above apply to emails.

screening, *see* Docket Item 104 ¶ 29. And as a result, DOCCS uses the content screening provided by JPay—a keyword targeting system—to read, detain, or destroy emails on an ad hoc basis. *See id.* ¶ 31; *see also* Docket Item 104-1.

Zielinski says that his own experience with tablets at several DOCCS facilities bears out those allegations.

## II. ZIELINSKI AND THE TABLET PROGRAM

"From April 2021 to September 2022," Zielinski was incarcerated at Attica, Docket Item 104 ¶ 49, where he came into contact with Superintendent Wolcott and Lieutenant/"Acting Captain" Leonard, *id.* ¶¶ 8, 13. Throughout Zielinski's "incarceration at Attica, the delivery of [his] electronic correspondence—both incoming and outgoing—was routinely delayed or rejected for no lawful reason and often with no notice to" him. *Id.* ¶ 51. This included messages relating to a separate lawsuit that Zielinski had filed "challenging an attempt . . . to ban family and friends from sending incarcerated people food packages," as well as "messages that contained nothing but the dates and times messages which had been unlawfully blocked were transmitted." *Id.* ¶ 54.

Beyond the routine delays and rejections, messages were also "remotely deleted" from the "sent box" on Zielinski's tablet "without notice or any process." *Id.* ¶ 57. And when Zielinski did receive written notice that his outgoing emails[12] had been censored, "the 'reasons' were pretextual and bore no connection whatsoever to reality." *Id.* ¶ 59. For example, one notification said that Zielinski's message had been censored

[12] Directive 4425 and the amended complaint use the terms "secure messaging," "electronic correspondence," and "email" interchangeably. *See generally* Docket Item 104; Docket Item 104-2. For the sake of consistency, the Court will generally refer to such messages as "emails" unless directly quoting from the parties' papers.

for the following reason: "Destructive Devices: Concerns the manufacture of weapons, explosives/destructive devices, or poison," but none of Zielinski's messages "had anything to do with [that]." *Id.* Moreover, because the notices never identified the message that had been censored and never included any comments, any "meaningful attempt to challenge the arbitrary censorship" was impossible. *Id.* And Zielinski says that other emails were "shadow block[ed]"—that is, left in "review" status indefinitely without anyone giving reasons or notice. *See id.* ¶¶ 38, 59.

Even worse, Zielinski's communications were censored and used to harass him based on their content. *See, e.g.*, *id.* ¶ 56. For example, when Zielinski attempted to send an op-ed that he had written about violations of the New York Humane Alternatives to Long-Term Solitary Confinement Act to an outside recipient, certain defendants sent "a copy of it to . . . Office of Mental Health . . . staff at the facility with a fictitious 'suicide alert' notice." *Id.* This practice—"baselessly attempting to trigger [the] DOCCS suicide risk intervention protocol"—"is a common form of retaliation in DOCCS prisons that, if successful, results in . . . moving the target to an isolation cell with no communication access." *Id.*[13] After this incident, Zielinski "omitted statements from his outbound electronic correspondence about his personal experience with the effects of isolated confinement out of concern they could expose him to retaliatory placement in 'observation' and render him effectively incommunicado." *Id.*

[13] When Zielinski asked for "the purported basis for the [suicide] alert," Office of Mental Health staff "produced a copy of the printed email of the op-ed." Docket Item 104 ¶ 56. That "could only have been provided by a DOCCS employee at" Leonard's rank "or higher," which would include Wolcott, since only those at that level had access to an inmate's email account. *Id.*

This pattern of harassment and censorship continued after Zielinski was transferred in September 2022 to the Great Meadow Correctional Facility where he came into contact with Superintendent Bradford and First Deputy Superintendent Torres. *See id.* ¶¶ 9-10, 61. "Arbitrary censorship at Great Meadow included an incident on or about October 2, 2022, when a friend of [Zielinski] emailed him information about programming in Python, a computer programming language [Zielinski] has studied while incarcerated." *Id.* ¶ 63. Zielinski "later learned" that his friend who sent the email received a notice saying that email "contained 'coded messages.'" *Id.* Zielinski "demanded" that Bradford, who "heard and decided" appeals of rejected emails,[14] release that email, "but Bradford, and possibly other defendants, refused to do so." *Id.* ¶¶ 62-63.

Less than two weeks later, Zielinski "sent an email to a professional journalist about a prison-reform advocacy group called Unchained, a bona fide not-for-profit organization that advocates for criminal justice reform." *Id.* ¶ 64. That email was "intercepted" "for the fictitious reason of 'Unauthorized organization' and remotely deleted" from Zielinski's "sent" box. *Id.* Zielinski once again appealed to Bradford, "who never responded, and the email remained unsent." *Id.*

The next day, Zielinski made a request under the New York Freedom of Information Law ("FOIL") "for a list of all JPay messages sent to him." *Id.* ¶ 66. In response, the "FOIL officer" told Zielinski that DOCCS staff are "not allowed to provide copies of messages as [they] can't access the information" and suggested that Zielinski instead "write JPay." *Id*. (some internal quotation marks omitted). Two days later,

[14] Bradford "sometimes" passed appeals along to Torres. Docket Item 104 ¶ 62.

Zielinski "made another FOIL request for all options that DOCCS staff can select . . . in the JPay software as a 'reason' for censoring an email," but even though the FOIL officer told Zielinski that he would look into it, Zielinski never received a response. *Id.* ¶ 67.

"From February 2023 to the date of" his amended complaint—August 28, 2025—Zielinski "was incarcerated at Woodbourne Correctional Facility." *Id.* ¶ 69.[15] As was the case at Attica and Great Meadow, "the same pattern of arbitrary censorship continued, with one or more defendants, including . . . Howard and Smith,[[16]] rejecting electronic correspondence and failing to provide notice or reasons." *Id.* And "where notice or reasons were given and appeals made by [Zielinski], appeals were not properly considered or rejected out of hand." *Id.* As but one example, Zielinski sent an email in March 2023 to the founder of a prison-reform advocacy group that "discuss[ed] various advocacy issues," only to see that email "intercepted for the stated reason of 'DOCCS policy: Concerns plans for activities which violate DOCCS policies.'" *Id.* ¶¶ 64, 70. No other comments or explanations were provided to Zielinski; when he appealed, "no response was ever received." *Id.* ¶ 70.

The situation escalated in November 2024, when Zielinski "became aware that" DOCCS officials had "removed dozens of emails and pictures that [Zielinski] had in his email account" without notification, including "some he had received over two years before." *Id.* ¶ 75. Because "other, older emails remained accessible" in Zielinski's

---

[15] Since the amended complaint was filed, Zielinski has been transferred multiple times. He is currently back at Attica. *See* Docket Item 167.

[16] Howard is the former Woodbourne superintendent, and Smith is the current superintendent. Docket Item 1 ¶¶ 11-12.

account, those emails must have been specifically removed. *See id.* And Zielinski has been "left to guess as to which messages and photos had been taken and by whom." *Id.*

The pattern of email interference has continued, including in connection with Zielinski's communications to outside journalists and legal organizations. *See id.* ¶¶ 71, 76-78, 81, 84-86. And even worse, in June 2025, "JPay began to autonomously intercept and replace individual characters within the text of outgoing emails." *Id.* ¶ 87. "For example, JPay began replacing semicolons (';') with spaces (' ') [and] ampersands ('&') with 'and', . . . thus altering electronic correspondence without notice to the corresponding parties." *Id.*

## <u>LEGAL PRINCIPLES</u>

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "When there are well-pleaded factual allegations [in the complaint], a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief," but that presumption is not afforded to "legal conclusions." *Id.* at 678-79. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

Zielinski raises nine claims under section 1983. First, he says that the defendants have violated and continue to violate his First Amendment rights to the free flow of incoming and outgoing mail, Docket Item 104 ¶¶ 97-98; the free flow of privileged correspondence, *id.* ¶¶ 99-100; and free communication with the press, *id.* ¶¶ 101-02. He also says that the defendants retaliated against him in violation of the First Amendment when they issued the false suicide alert. *Id.* ¶¶ 103-06.

Zielinski also claims that his "inability to meaningfully challenge the blocking of his incoming and outgoing" emails violates his right to procedural due process, *id.* ¶¶ 107-09, and that the defendants' "policies and customs," including Directive 4425, are both void for vagueness and overbroad, *id.* ¶¶ 110-14. Along the same lines, he says that "even if access to electronic communications is provided as a benefit . . . , [the d]efendants cannot condition . . . access to those communications on acceptance of unconstitutional policies"; he says that the defendants therefore are violating his rights by conditioning his ability to send and receive emails on his accepting their unconstitutional policies. *Id.* ¶¶ 115-16. And he says that Directive 4425 permits the defendants to inspect his emails without "good or reasonable cause," thus violating his rights under the Fourth Amendment. *Id.* ¶¶ 117-18.

Except for the claims against JPay, which is a private corporation, and Annucci, who has not been the DOCCS "Acting Commissioner" since June 2023, all claims are

brought against the defendants in both their individual and official capacities. *Id.* ¶¶ 4-13.[17]

## I. SECTION 1983 LIABILITY

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). "In order to state a claim under [section] 1983, a plaintiff must allege that he was injured by either a state actor or a private party acting under color of state law." *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002). And "[a] prerequisite to a claim for damages under [s]ection 1983 . . . is a defendant's 'personal involvement' in the alleged constitutional violation." *Carwell v. City of New York*, 2023 WL 419182, at *5 (S.D.N.Y. Jan. 26, 2023) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001)). As a threshold matter, JPay and three of the DOCCS Defendants—Annucci, Martuscello, and McKoy—say that they are not properly the subject of claims under section 1983.

[17] Bradford, Torres, and Howard are sued in their official capacities "to the extent [they] remain[] presently employed at any DOCCS facility." Docket Item 104 ¶¶ 9-11.

### A. Color of State Law

JPay argues that it cannot be held liable under section 1983 because both the policy and conduct that Zielinski challenges "were implemented, retained[,] and carried out by DOCCS and its employees, not [by] JPay." Docket Item 119-1 at 20 (italics omitted). And for that reason, JPay says, it was not acting "under color of state law" as required for liability under section 1983.

"Because the United States Constitution regulates only the [g]overnment, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action."[18] *Ciambriello*, 292 F.3d at 323 (quoting *United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1295 (2d Cir. 1991)). Thus, "a [section] 1983 claim against a private actor will usually fail because private actors do not act under the color of state law, no matter how 'discriminatory or wrongful' their conduct might be." *Alicea v. Yang*, 2023 WL 5994211, at *1 (2d Cir. Sep. 15, 2023) (summary order) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).

Nevertheless, as Zielinski observes in his response to JPay's motion, *see* Docket Item 134 at 12-13, "under certain circumstances, conduct by a private entity can constitute state action," *Dubarry v. Annucci*, 2022 WL 4485359, at *11 (S.D.N.Y. Sep. 27, 2022); *see also Daley v. Town of Orchard Park*, 2017 WL 417248, at *6 (W.D.N.Y.

[18] As has been noted by another district court, because "[a] private party acts under color of state law for purposes of a [section] 1983 action where that party engages in conduct that would constitute 'state action' for purposes of the Fourteenth Amendment," the terms state action and under color of state law are used interchangeably. *See Wieder v. City of New York*, 2013 WL 1810751, at *6 (E.D.N.Y. Apr. 29, 2013).

Jan. 30, 2017) (Wolford, J.) ("Conduct that is formally private may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." (alteration, citations, and internal quotation marks omitted)). In fact, the Second Circuit has "identified three main tests to determine" whether an otherwise private entity, such as JPay, engaged in state action:

> (1) whe[ther] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) whe[ther] the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); and (3) whe[ther] the entity has been delegated a public function by the state ("the public function test").

*See Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022) (alterations omitted) (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).

Despite the Second Circuit's identification of these tests as separate, "it is not necessary to neatly cabin . . . arguments" within "the public function, joint action, and entwinement theories." *Forbes v. City of New York*, 2008 WL 3539936, at *6 (S.D.N.Y. Aug. 12, 2008). And regardless of the test, "[t]he fundamental question" is the same: "whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant*, 691 F.3d at 207 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

JPay focuses on the second test and urges the Court to follow the holding in *Dubarry*, *see* Docket Item 119-1 at 18, a case where prisoners challenged the enforcement of a policy that denied them "nude photographs and videos" on their JPay tablets, 2022 WL 4485359, at *1. There, the court concluded that JPay was not a state actor because it "is comparable to an entity providing telephone services," something that is not typically the function of the state to provide. *See id.* at *12.

Viewed in light of the allegations in that case and the caselaw concerning the "narrow" extent of the "public function exception," *Hollman v. County of Suffolk*, 2011 WL 280927, at *5 (E.D.N.Y. Jan. 27, 2011), that outcome flowed naturally. As the court noted in *Dubarry*, typically "[t]he fact that the state may contract with a private party to perform a function does not transform the private party into a state actor unless the function is traditionally exclusively a state function." 2022 WL 4485359, at *12 (quoting *Phelan ex rel. Phelan v. Torres*, 843 F. Supp. 2d 259, 273 (E.D.N.Y. 2011)). That is because the function being performed by the private party under a contract with the government cannot simply be any function but instead needs to be a function that "has been 'traditionally the *exclusive* prerogative of the State.'" *Hollman*, 2011 WL 280927, at *5 (quoting *Rendell-Baker*, 457 U.S. at 842). And that may depend on the context in which the function is performed.

Take hospital care, for example. "[G]eneral hospital functions are generally not traditionally associated with sovereignty under the public function test." *Id.* (citation and internal quotation marks omitted). But because "[a]n inmate must rely on prison authorities to treat his medical needs," *West v. Atkins*, 487 U.S. 42, 54 (1988) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)), the medical care of a prison inmate becomes a sovereign function. And for that reason, when a private party performs that sovereign function by providing medical care to prison inmates, it may be a state actor liable under section 1983. *See Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264-65 (2d Cir. 2014) ("Under the public function test . . . courts have found state action when private parties perform such sovereign functions as medical care for prison inmates.").

In contrast, providing such things as telephone services and Wi-Fi access "are not functions that have been traditionally performed by governments." *Stevens v. Cuomo*, 2021 WL 3165364, at *3 (N.D.N.Y. July 27, 2021). So "[c]ourts have repeatedly found that contracting with a prison to provide telephone services does not on its own make a private company a state actor." *Smith v. NYC Dep't of Corr.*, 2019 WL 2473524, at *3 (S.D.N.Y. June 13, 2019), *report and recommendation adopted*, 2019 WL 2866729 (S.D.N.Y. July 3, 2019). In light of those principles, the non-binding holding in *Dubarry*—where the allegations suggested only that "JPay is a private entity that has contracted with DOCCS to provide media services to inmates . . . via tablet devices," *see* 2022 WL 4485359, at *2—makes perfect sense.

But in light of the many allegations Zielinski makes in the amended complaint, that is not the case here. More specifically, Zielinski says that beyond merely contracting with DOCCS to provide tablets to inmates, JPay has a "close and ongoing partnership" with DOCCS that is "far more integrated than a customary arm's length contract between prison facility and vendor." Docket Item 134 at 14-15 (citing Docket Item 104-1). As evidence, he points to their file integration partnership, their "joint marketing campaign for the system launch," and their coordinated training efforts, as well as the statement of work that requires JPay "to be actively engaged 'on a daily basis' with administering the system." *See id.* (quoting Docket Item 104-1 at 26-27). And the root of this joint conduct, Zielinski says, is that "JPay configured its email program software to allow" surveillance and censorship of inmates' emails through its keyword targeting system. Docket Item 134 (citing Docket Item 104 ¶¶ 36-38).

In light of all that, Zielinski urges the Court to follow the holdings in other cases that found state action to have been sufficiently alleged when the complaint raised something "more" than simply providing some form of telephone, internet, or email access to prisoners—joint monitoring, for example. *See Hurdsman v. Viapath Techs., Inc.*, 2022 WL 16927852, at *3 (E.D Ark. Oct. 25, 2022), *report and recommendation adopted*, 2022 WL 16923219 (E.D. Ark. Nov. 14, 2022); *Washington v. Reliance Tel. Sys.*, 2019 WL 5580954, at *3 (D.N.D. Oct. 29, 2019); *Walen v. Embarq Payphone Servs., Inc.*, 2009 WL 3012351, at *3 (E.D. Mich. Sep. 17, 2009).

Drawing all inferences in Zielinski's favor—as it must on a motion to dismiss—the Court agrees with that line of cases and finds their reasoning persuasive. Like the plaintiffs in those cases, Zielinski takes issue with JPay's role in monitoring his correspondence, alleging that JPay and DOCCS monitor email jointly. *See* Docket Item 104 ¶ 44 (alleging that "JPay is and at all relevant times has been operating as a state actor by engaging in joint activity with DOCCS" including "by allowing and assisting DOCCS employees to access, read, censor[,] and otherwise interfere with electronic correspondence"). And that tips the balance from purely private action to state involvement. *See, e.g.*, *Washington*, 2019 WL 5580954, at *3 ("It is not the mere provision of telephone services that is at issue here, however. The focus of [plaintiff]'s claim is largely on the alleged monitoring of telephone calls with [his] counsel.").

Stated another way, Zielinski focuses not on the fact that JPay provides tablets and related services, including the ability to send emails, to prisoners. Rather, he takes issue with the fact that the system JPay provides automatically monitors all of his emails and that the monitoring would not be possible without JPay's technology and

involvement. What is more, he alleges that JPay provides DOCCS with technical support, has specially configured the system to fit DOCCS's needs, and has engaged in a joint training program to introduce the system. And he says that DOCCS employees have told him that only JPay would have certain information he requested about the monitoring of his email. Docket Item 104 ¶ 66. Those allegations are sufficient to plead state action by JPay and to survive a motion to dismiss on that necessarily fact-intensive issue. *See Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 939 (1982) (state action is a "necessarily fact-bound inquiry").[19]

### B. Personal Involvement

"To establish a [s]ection 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023) (citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)). Three of the DOCCS Defendants—former "Acting Commissioner" Annucci, current Commissioner Martuscello, and Deputy Commissioner McKoy[20] (collectively, the "supervisory DOCCS Defendants")—say that Zielinski has failed to adequately allege their personal involvement in the violations. This Court agrees, but for reasons other than the ones they raise.

---

[19] JPay may well be correct that once both sides have had the benefit of discovery, there will not be enough evidence that it acted or is acting jointly with the state. But that is a question for summary judgment, not a motion to dismiss. *See Hurdsman*, 2022 WL 16927852, at *3 ("The facts as alleged by [the p]laintiff satisfy this test [for state action]. Whether [the p]laintiff has evidence [that the private defendant], or any of the other [d]efendants, were actively involved in recording and handing over his telephone calls . . . to authorities is a question for another day.").

[20] McKoy is incorrectly spelled "McCoy" on the docket. The Clerk of the Court shall correct the spelling of his name.

As noted above, to establish liability against a government official under section 1983, "a plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676). The supervisory DOCCS Defendants say that they cannot be held liable "merely because" they "held . . . high position[s] of authority," *see* Docket Item 125-1 at 11, and they cite the Second Circuit's decision in *Tangreti* to support their argument.

In light of *Tangreti's* significance, it is worth briefly reviewing the court's analysis and the context of its decision. Before *Tangreti* was decided, the Second Circuit's test for supervisory liability was governed by the standard articulated in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995). Under that standard, a plaintiff could "establish a supervisory defendant's 'personal involvement' in a constitutional violation" by showing that "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Stone #1 v. Annucci*, 2021 WL 4463033, at *6 (S.D.N.Y. Sep. 28, 2021) (second excerpt quoting *Colon*, 58 F.3d at 873). But after the Supreme Court held that notwithstanding the title of a supervisory government official, the official is liable "only . . . for his or her own misconduct," *Iqbal,* 556 U.S. at 677, courts in the

Second Circuit reached different conclusions about the "impact of [*Iqbal*]" on the *Colon* standard, *see Stone #1*, 2021 WL 4463033, at *6.

*Tangreti* clarified the issue. In that case, the court addressed an inmate's section 1983 suit brought against a group of defendants—including a supervisor—relating to alleged sexual abuse by correction officers. 983 F.3d at 612. "[T]he only evidence that [the supervisory defendant] subjectively knew of a risk to the plaintiff was that she observed the plaintiff interacting with a correction officer inappropriately on two occasions." *Stone #1*, 2021 WL 4463033, at *7 (citing *Tangreti*, 983 F.3d at 619-20). The Second Circuit concluded that because there is no "special rule for supervisory liability," *Tangreti*, 983 F.3d at 612, the fact that that supervising defendant "could or should have known of a risk to inmate safety was inadequate" to establish her liability, *see Stone #1*, 2021 WL 4463033, at *7.

In light of *Tangreti*, the supervisory DOCCS Defendants are correct that each alleged violation "must be established against [each] supervisory official directly." *See* 983 F.3d at 618. But as Zielinski argues, Docket Item 135 at 12, district courts in this Circuit have concluded that "*Tangreti* does not suggest that *Colon*'s third factor—whereby a defendant can be said to be personally involved in a constitutional violation if he created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom—could never form the basis of an official's liability," *see Stone #1*, 2021 WL 4463033, at *8 (citation and internal quotation marks omitted); *see also Brunache v. Annucci*, 2023 WL 146850, at *12 (W.D.N.Y. Jan. 9, 2023) (*Tangreti* "did not suggest that a defendant who created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a

policy or custom, cannot be found liable under [s]ection 1983." (citation and internal quotation marks omitted)). And that makes sense: "An individual who creates a policy or custom whereby the [C]onstitution is violated . . . is more directly and personally involved in the constitutional violation than someone who is only negligent in his supervision of the official committing the underlying offense." *Stone #1*, 2021 WL 4463033, at *8.

With those principles in mind, the Court agrees with Zielinski that he has sufficiently alleged the personal involvement of the supervisory DOCCS Defendants in enacting the policy that he alleges is unconstitutional—Directive 4425. As alleged in the amended complaint, Annucci negotiated the contract with JPay and promulgated multiple versions of Directive 4425, Martuscello continued the policy, and McKoy signed both versions of Directive 4425. Docket Item 104 ¶¶ 20, 24-25.

But as is also the case in the wake of *Tangreti*, simply alleging involvement in enacting or continuing a policy is not enough; a plaintiff also must allege "that a senior official promulgated an unconstitutional policy with a culpable mental state." *Stone #1*, 2021 WL 4463033, at *8. And while "courts recognize the commonsense principle that a plaintiff will often not be equipped to come forward" at the pleading stage "with direct evidence of a defendant's subjective or actual knowledge or [ ] intent," the complaint still must "include allegations of the facts or events [the plaintiff] claim[s] give rise to an inference of knowledge." *Id.* at *10; *see also id.* (mens rea could be established at pleading stage by "showing that defendants were on notice of previous instances of sexual abuse"). Therefore, Zielinski must allege facts showing that the supervisory DOCCS Defendants "bore the responsibility for creating or allowing the continuance of"

the relevant policy, that the policy "proximately caused the harm and constitutional violation[s he] allegedly suffered," and that the supervisory defendants "possessed the requisite mens rea to be held liable." *Elting v. Lassiter*, 2023 WL 8699454, at *6 (S.D.N.Y. Dec. 14, 2023) (citation, internal quotation marks, and underline omitted).

While Zielinski plausibly pleads the first two elements, he does not plead any facts showing the supervisory DOCCS Defendants' state of mind, let alone that those defendants were "on notice" of the constitutional risks created by Directive 4425. For that reason, he has not plausibly alleged the personal involvement of the supervisory DOCCS Defendants, and the damages claims against those defendants therefore are dismissed.[21] But because that analysis does not apply to Zielinski's other forms of

[21] JPay also argues that it was not personally involved in any alleged violations. According to the amended complaint, JPay says, "DOCCS, not JPay, makes censorship decisions," Docket Item 119-1 at 14, and all decisions are made by applying a DOCCS policy, *id.* at 15. "At most," JPay argues, Zielinski "alleges that JPay's software includes functionality allowing DOCCS to screen or flag messages." *Id.* at 15. And it says that "[m]erely designing software with features that a government agency configures and controls does not constitute 'personal involvement' in any alleged constitutional violation." *Id.* at 15-16.

That argument misconstrues what Zielinski alleges. While Zielinski says that DOCCS has acted unconstitutionally by enacting a policy that violates the First Amendment and that he has been injured by actions taken under that policy, those allegations are not limited to the application of the policy by the DOCCS Defendants. Rather, he says, those violations would not have been possible without the assistance JPay has rendered to DOCCS by providing it with a specially configured email monitoring system. *See generally* Docket Item 104 ¶¶ 36-38. In other words, Zielinski alleges that DOCCS used that system, which JPay configured at the request of DOCCS, to commit constitutional violations (with some exceptions noted below) as alleged in the amended complaint. And he alleges that JPay continues to actively work with DOCCS by providing the technical support for the system that injured and continues to injure him.

Just as the facts eventually may not prove state action, it certainly is possible that discovery will bear out JPay's argument. But once again, that is a question for another day. Based on the allegations in the amended complaint and drawing all inferences in

requested relief—declaratory and injunctive relief—those claims against the supervisory DOCCS Defendants remain. *See Sughrim v. New York*, 503 F. Supp. 3d 68, 92 (S.D.N.Y. 2020) ("Proof of an individual defendant's personal involvement in the alleged wrong is . . . a prerequisite to his liability on a claim for *damages* under [section] 1983." (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (emphasis added)).

## II. ZIELINSKI'S CLAIMS

Having decided those preliminary issues, the Court turns to each of Zielinski's claims, beginning with the three claims he brings under the First Amendment.

### A. First Amendment

In their motions to dismiss, the defendants mischaracterize Zielinski's First Amendment and due process claims. For that reason, the Court first addresses the contours of those claims.

The DOCCS Defendants say that Zielinski takes issue with the behavior of individual DOCCS employees who have blocked, deleted, or shadow-banned his emails. Docket Item 125-1 at 14. In other words, they say that Zielinski's claim has little

---

Zielinski's favor, it is plausible that JPay has provided, customized, and supported the very system about which Zielinski complains and therefore has been and continues to be involved in the constitutional violations he alleges. If that is not "a tangible connection" with "the injuries suffered," then the Court struggles to think of what would be. *See Quinones v. City of Binghamton*, 2022 WL 43764, at *5 (N.D.N.Y. Jan. 5, 2022) (citation and internal quotation marks omitted); *see also Salvana v. New York State Dep't of Corr. And Comm. Supervision*, 621 F. Supp. 3d 287, 311 (N.D.N.Y. 2022) ("A plaintiff must allege a tangible connection between the acts of a defendant and the injuries suffered." (citation and internal quotation marks omitted)). The Court therefore denies JPay's motion to dismiss insofar as it is based on alleged lack of personal involvement.

to do with Directive 4425 but is really about actions taken by individual DOCCS employees (or unknown JPay employees) to interfere with his emails. Moreover, both defendants say that Zielinski's claims fail because he has no constitutionally protected right—and consequently no liberty interest—to communicate by email while he is incarcerated. *See* Docket Item 119-1 at 20-22; Docket Item 125-1 at 16.[22]

But neither of those arguments captures what Zielinski really claims, which is much simpler than the length of the pleadings and papers suggests. At its core, Zielinski's amended complaint alleges that Directive 4425 treats electronic messages differently from physical mail. It does that, Zielinski says, by not distinguishing between incoming and outgoing communications, by not providing procedures to protect privileged communications, and by using a system that allows messages to be rejected and held back for contrived reasons or no reason at all and with no real explanation. Therefore, he says, Directive 4425 is unconstitutional on its face, and his rights have been violated by a series of actions consistent with policies that treat emails differently than physical correspondence: for example, searching outgoing emails in the same way that incoming emails are searched, indefinitely holding emails for review, remotely deleting previously sent or received emails, and blocking messages that would otherwise be protected under Directive 4421 if sent as physical mail.

[22] Zielinski says that JPay tries to "have it both ways by actively defending" DOCCS policy "while disclaiming any involvement in it." *See* Docket Item 134 at 15 n.2. As JPay notes, however, "there is no conflict or inconsistency between [its] argument that it is not a state actor and its argument that Directive . . . 4425 does not violate the Constitution." Docket Item 164 at 5. And the Court agrees: parties often make arguments in the alternative, and courts consider them all. The Court therefore has considered all arguments raised by JPay, just as it has considered all of Zielinski's arguments.

Zielinski argues that those practices and procedures have violated and continue to violate three rights that he enjoys under the First Amendment: the right to the free flow of incoming and outgoing general correspondence, the right to the free flow of privileged correspondence, and the right to freely communicate and work with bona fide members of the media. Docket Item 104 ¶¶ 97-104. More specifically, Zielinski says that by automatically subjecting all electronic messages to monitoring, Directive 4425 is "inconsistent with constitutional protections required for physical mail" and is "greater than necessary" because it covers privileged correspondence and communications with "bona fide members of the media." *Id.* ¶¶ 98-102.

The Court therefore first "balance[s] competing principles" to determine the First Amendment protections that prisoners, including Zielinski, enjoy. *See Reynolds v. Quiros*, 25 F.4th 72, 83 (2d Cir. 2022). On the one hand, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). But "[o]n the other hand, 'the fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.'" *Reynolds*, 25 F.4th at 83 (quoting *Jones v. North Carolina Prisoners' Lab. Union*, 433 U.S. 119, 125 (1977)).

Therefore "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "Among the protections enjoyed by prison inmates, though not unfettered, is the right to the free flow of incoming and outgoing mail guaranteed by the First Amendment." *Hill v. Griffin*, 2012

WL 92556, at *4 (W.D.N.Y. Jan. 11, 2012) (citation and internal quotation marks omitted). And "challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Pell*, 417 U.S. at 822. Moreover, "deference should be accorded to decision-making in the corrections system because courts are 'ill equipped to deal with the increasingly urgent problems of prison administration and reform.'" *Reynolds*, 25 F.4th at 83 (quoting *Turner*, 482 U.S. at 84-85).

In the context of prison regulations concerning physical mail, the relevant standards are well established. "Restrictions on incoming correspondence are subjected to a reasonableness test whereas restrictions on outgoing correspondence are subjected to a more restrictive test." *DiRose v. McClennan*, 26 F. Supp. 2d 550, 553 (W.D.N.Y. 1998). More specifically, restrictions on incoming correspondence are "valid if they are reasonably related to legitimate penological interests." *Id.* (quoting *Turner*, 482 U.S. at 89 (alteration omitted)).[23] In contrast, restrictions on outgoing correspondence must "further an important or substantial governmental interest unrelated to the suppression of expression," and the resulting "limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *See Procunier v. Martinez*,

---

[23] The *Turner* test also directs the court to examine "whether there are alternative means of exercising the right that remain open to prison inmates"; the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and "the existence of obvious, easy alternative[]" approaches that could "fully accommodate[] the prisoner's rights at de minimis cost to valid penological interests." *Turner*, 482 U.S. at 90-91 (italics omitted).

416 U.S. 396, 413-14 (1974); *Acevedo v. Fischer*, 2014 WL 5015470, at *3 (S.D.N.Y. Sep. 29, 2014) (noting that *Martinez* standard applies to outgoing mail). There is good reason for that distinction: as the Supreme Court has noted, unlike incoming mail, outgoing mail does not, "by its very nature, pose a serious threat to prison order and security." *Thornburgh v. Abbott*, 490 U.S. 401, 411 (1989).[24]

Zielinski says that "electronic correspondence should receive *no less protection* than physical mail." *See* Docket Item 135 at 16. In other words, he says that Directive 4425 should be evaluated under the *Turner* standard for incoming email and the *Martinez* standard for outgoing email. But as at least one court already has noted, whether to apply the *Turner*/*Martinez* dichotomy to the regulation of emails "presents a difficult question of constitutional law." *Bailey v. Fed. Bur. of Prisons*, 2024 WL 3219207, at *5 (D.D.C. June 28, 2024) (Friedman, J.).

Email can "be sent at rapid pace and to a wider audience" and therefore "may not be as inherently safe" as outgoing physical mail. *See id.* Moreover, as Judge Friedman noted in an analogous case involving "an advocate for federal prison reform" who was restricted from contacting inmates at federal prison facilities, prison administrators can take actions that do not outright restrict emails but functionally do just that, such as implementing a temporary lockdown that prevents inmates from accessing computers.

---

[24] Moreover, as specifically relevant to Zielinski's second and third claims, "[l]egal mail is entitled to greater protection from interference than nonlegal mail." *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 210 (N.D.N.Y. 2015). And, in light of "the fact that the condition of our prisons is an important matter of public policy," an inmate's right "to communicate with a representative of the news media" is one of the rights that "survives incarceration." *See Burnham v. Oswald*, 342 F. Supp. 880, 885 (W.D.N.Y. 1972) (Curtin, J.) (citation and internal quotation marks omitted).

*See id.* at *1, *5; *cf. Benning v. Dozier*, 2021 WL 1713333, at *1 (M.D. Ga. Apr. 30, 2021) ("Should censorship of prisoner email be treated the same as censorship of traditional prisoner mail when deciding whether that censorship violates the First Amendment or the Fourteenth Amendment's guarantee of procedural due process? This case requires the Court to grapple with that question. And it's a much tougher question than it appears at first blush."). Luckily, the Court need not answer that thorny question because it reaches a conclusion similar to the one reached by Judge Friedman when analyzing the restrictions in *Bailey*: that is, by automatically subjecting incoming and outgoing emails to inspection regardless of the sender or recipient, Directive 4425 does not pass muster even under the defendants' preferred *Turner* test.

As noted above, the guiding principle of the *Turner* test is whether a regulation is "reasonably related to legitimate penological interests." 482 U.S. at 89. "In fleshing that standard out, the Supreme Court explained: 'First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.'" *Benning v. Oliver*, 2024 WL 4818330, at *10 (M.D. Ga. Nov. 18, 2024) (quoting *Turner*, 482 U.S. at 89). And that criterion "must 'be satisfied if the policy is to survive.'" *Id.* at *10 (quoting *Pesci v. Budz*, 935 F.3d 1159, 1167 (11th Cir. 2019)); *see also Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001) ("If the connection between the regulation and the asserted goal is arbitrary or irrational, then the regulation fails, irrespective of whether the other factors tilt in its favor." (internal quotation marks and citation omitted)).

On that point, both sets of defendants say essentially the same thing: that there is a connection between automatically reviewing all messages as provided in Directive

4425 and maintaining prison order and that to serve that interest, DOCCS must be able to "investigate and prevent any conduct that may be potentially dangerous" to staff and inmates. Docket Item 125-1 at 15 (internal quotation marks omitted); *see also* Docket Item 119-1 at 24; Docket Item 141 at 7 ("Putting reasonable safeguards and other precautions in place regarding electronic communications are clearly a legitimate government interest."). But that same reasoning undoubtedly applies to physical mail, and the defendants offer no explanation for why outgoing email, including privileged email, must be treated differently than outgoing physical mail. *See Benning*, 2024 WL 4818330, at *10 (finding that Georgia restriction limiting inmates' ability to send emails to only a set list of individuals had no rational connection with asserted security goal "in light of the unlimited contacts an [inmate] might have via handwritten letters"). And even accepting the security-related concerns that the defendants raise, the Court cannot see how there is a rational connection between the extremes permitted by Directive 4425—in particular, inspecting privileged communications as a matter of course—and maintaining order and security. In other words, while there may well be a rational connection between prison order and inspecting certain emails, there is no rational connection between prison order and automatically screening all incoming and outgoing emails—including privileged communications. So the first *Turner* factor cuts in favor of Zielinski.

Moreover, while inmates like Zielinski have other ways to communicate with the outside world—physical mail and phone calls, for example—Zielinski alleges that the tablet program is now the predominant means of communication for inmates housed in DOCCS facilities. Docket Item 104 ¶ 20. Indeed, Zielinski says that for some inmates,

email is their only method of contacting certain individuals. *Id*. The second factor therefore is at best neutral.

As to the third factor—whether "accommodating" the constitutional right would have an adverse impact on guards and other inmates—reducing email screening to match screening physical mail would be less of a burden. And likewise on the fourth factor: there is "an alternative that fully accommodates" a prisoner's rights "at de minimis cost to valid penological interests," *see Turner*, 482 U.S. at 91 (italics omitted)—subjecting outgoing emails, and emails with attorneys or that are otherwise privileged, to some lesser form of restrictions. Therefore, the Court has little trouble concluding—at least at this early stage where it is limited to Zielinski's allegations and the information in the documents attached to his complaint—that Directive 4425's blanket screening of all email messages is not a rational response to a legitimate penological need. *See Benning*, 2024 WL 4818330, at *10-11 (concluding that three of the four *Turner* factors weighed against restriction limiting inmates' ability to send emails to only a set list of individuals while no similar limit existed for physical mail).

And because Directive 4425 does not satisfy *Turner*,[25] Zielinski raises plausible claims under the First Amendment—both facially and as applied.[26]

---

[25] Zielinski also claims that Directive 4425 is overbroad. Docket Item 104 ¶ 114. "[T]he thrust of an overbreadth challenge is that, while the statute in question may have been validly enforced against the plaintiff, the statute is so broadly written as to sweep in constitutionally protected conduct, thereby chilling such activity by those not before the Court." *Corso v. Fischer*, 983 F. Supp. 2d 320, 331 (S.D.N.Y. 2013). "A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006). "Facial challenges . . . are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984). As Zielinski says, because Directive 4425 "provides prison officials with authority to read *all* electronic correspondence between incarcerated individuals and non-incarcerated individuals," it sweeps in communications with an inmate's attorney that are protected by the Constitution. Docket Item 135 at 21. Because that claim is essentially duplicative of what Zielinski raises in his other First Amendment claims—that Directive 4425 is unconstitutional because it treats all emails the same—the Court finds his overbreadth claim duplicative and dismisses it for that reason. *See Lumumba v. Kiser*, 116 F.4th 269, 279-80 (4th Cir. 2024) (concluding that "[b]ecause *Turner* establishes the standard for vindicating First Amendment rights in prison," a plaintiff could not "bring an overbreadth challenge separate from *Turner*").

[26] Zielinski challenges Directive 4425 both facially and as applied. Docket Item 104 ¶¶ 98, 100, 102. "A 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual," *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (citation omitted), while an as-applied challenge requires an analysis of a case's facts "to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right," *id.* at 174-75 (citation omitted). As discussed above, the Court concludes that Zielinski has sufficiently alleged that Directive 4425 interferes with his Constitutional rights. Moreover, he has alleged various instances in which the directive infringed on his rights to the free flow of general correspondence, the free flow of privileged correspondence (such as his communications with legal organizations), and the right to communicate with, and author content for, the media. Therefore, he has plausibly alleged that Directive 4425 violates his First Amendment rights both facially and as applied.

### B. Procedural Due Process

Zielinski's procedural due process claim is linked to his First Amendment claims. More specifically, he alleges that Directive 4425 has rendered him unable to "meaningfully challenge the blocking of his incoming and outgoing electronic correspondence," and has thus deprived him of his liberty and property interests in his emails. Docket Item 104 ¶¶ 108-09.

The Fourteenth Amendment's due process clause "prohibits states from 'depriving any person of life, liberty, or property[] without due process of law.'" *Matzell v. Annucci*, 64 F.4th 425, 436 (2d Cir. 2023) (quoting U.S. Const. amend. XIV, § 1). "A procedural due process claim consists of two elements: (i) deprivation by state action of a protected liberty interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023); *see also Rodriguez v. City of New York*, 623 F. Supp.3d 225, 245 (S.D.N.Y. 2022) ("To award damages under 42 U.S.C. § 1983 for an alleged violation of procedural due process, a court must find that, as the result of conduct performed under color of state law, the plaintiff was deprived of life, liberty, or property without due process of law." (quoting *Walker v. Mattingly*, 2012 WL 1160772, at *5 (W.D.N.Y. Apr. 5, 2012))).

The defendants say that Zielinski's procedural due process claims fail for two reasons: first, because he does not have a protected interest in using emails to communicate while incarcerated, Docket Item 119-1 at 26-27; Docket Item 125-1 at 23, and second, because he has adequate process in that he could have commenced an Article 78 proceeding in state court to challenge any message rejections, Docket Item 125-1 at 25-26. Although the caselaw on these types of claims is in a state of flux and rapidly evolving, the Court ultimately disagrees with both arguments.

As the Supreme Court noted in *Martinez*, "[t]he interest of prisoners and their correspondents in uncensored communication by letter . . . is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstances of imprisonment." 416 U.S. at 418. "As such," communication by mail "is protected from arbitrary government invasion." *Id.* And the United States Court of Appeals for the Eleventh Circuit recently extended that principle to emails, holding that a prisoner "had a protected liberty interest" in his email messages. *See Benning v. Comm'r, Ga. Dep't of Corr.*, 71 F.4th 1324, 1330 (11th Cir. 2023). As that decision noted, emails "undoubtedly constitute[] speech under the First Amendment." *Id.* What is more, the court said, *Martinez* already had been applied broadly to "correspondence from inmates, regardless of the form (or medium) the correspondence takes." *Id.* So "[j]ust as the Fourth Amendment protects against searches by technology unknown in the 18th century, the First Amendment protects correspondence transmitted by means developed in the 20th or 21st centuries." *Id.* at 1331 (citation omitted).

This Court is persuaded by the well-reasoned opinion in *Benning* and, for those same reasons, agrees that Zielinski has a protected liberty interest in his emails.[27] *See*

[27] The *Benning* court considered the same argument that both sets of defendants raise here: that the use of email by a prisoner is not a right but a privilege, *see* Docket Item 119-1 at 22 (arguing that "DOCCS did not act under a constitutional requirement to provide email access to prisoners"); Docket Item 125-1 at 23. But the court found that argument unconvincing in light of the Supreme Court's "reject[ion of] the wooden distinction between rights and privileges that once seemed to govern the applicability of procedural due process." 71 F.4th at 1332 (citation and internal quotation marks omitted); *see also Bailey*, 2024 WL 3219207, at *11 ("[A]s [plaintiff] correctly argues . . . the [defendant] cannot unilaterally opt out of . . . constitutional requirements by characterizing [electronic messaging system] as a privilege." (citation and internal quotation marks omitted)). Therefore, while the defendants are correct that DOCCS was not constitutionally required to provide the email system, that system cannot be provided in a manner that violates the Constitution.

*also Bailey*, 2024 WL 3219207, at *11 ("While a literal reading of the Supreme Court's due process holding in *Martinez* would be binding only as to postal mail, there is no principled basis on which to distinguish a liberty interest in uncensored postal mail from a liberty interest in uncensored electronic mail."); *Kilbourne v. Washington*, 2025 WL 1617831, at *3-4 (E.D. Mich. Apr. 16, 2025) (concluding that Michigan prison policy under which prisoners were not "entitled" to notice of email rejections "deprive[d] prisoners of the minimum procedural safeguard required under *Martinez*").[28]

Turning to the question of process, *Martinez* once again provides a guide. There, the Supreme Court wrote that "the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." *See* 416 U.S. at 417. "Accordingly, prison staff are 'generally required' to provide inmates with notice and an opportunity to object to the confiscation or rejection of correspondence." *Moyler v. Fannin*, 2023 WL 2541131, at *7 (W.D. Va. Mar. 16, 2023) (collecting cases). "Without timely notice of the [email rejection], accompanied by the information necessary to file a proper and timely grievance, an inmate loses the opportunity to protest the decision, which is also required for due process." *Tory v. Davis*, 2024 WL 3331668, at *5 (W.D. Va. July 8, 2024) (emphasis omitted).

In essence, any form of process—whether it be an Article 78 proceeding or a grievance—is useless unless the inmate gets timely notice that an incoming or outgoing email has been rejected and withheld so that the inmate can pursue that process. And whether an inmate eventually learns from another source—such as the party outside

---

[28] Because the Court concludes that Zielinski has a liberty interest in his emails, it need not address his claim that he also has a property interest in those emails. Docket Item 104 ¶ 109.

prison with whom he is corresponding—that an email was not delivered is irrelevant to the question of proper notice. *See Moyler*, 2023 WL 2541131, at *7 ("Certainly, [plaintiff] eventually learned from family members that he did not receive all of the photographs emailed to him through JPay, but his general awareness that photographs were withheld is not sufficient to establish the notice required to satisfy due process.").

In light of those principles, Zielinski's allegations more than pass muster: He alleges not only that he has received "fictitious" notices or notices that make no sense but also that he sometimes was not given any notice at all.[29] *See, e.g.*, Docket Item 104 ¶ 63 (alleging that email sent to Zielinski was rejected without notice to him and with the sender receiving only "a fictitious notice that" the email "contained 'coded messages'"). And Zielinski says that, even worse, many of his messages are sent to a purgatory where they indefinitely await rejection—in other words, he says that the defendants have created a system that deprives him of a liberty interest without the need to give him notice. *See, e.g.*, Docket Item 104 ¶ 55 (alleging that Zielinski's outgoing email was blocked indefinitely). Therefore, the amended complaint plausibly raises a procedural due process claim based on the rejection, shadow-banning, and deletion of Zielinski's email messages.

### C. First Amendment Retaliation

"The government cannot circumvent the First Amendment by retaliating against those who have spoken instead of directly restricting their speech." *Bailey*, 2024 WL 3219207, at *10; *see also Bradshaw v. Piccolo*, 772 F. Supp. 3d 331, 351 (W.D.N.Y.

---

[29] In fact, as discussed above, *see supra* Section I (Background), that practice actually seems to be permitted for incoming messages.

2025) ("It is well settled that prison officials may not retaliate against prisoners for exercising their constitutional rights."). To succeed on a First Amendment retaliation claim, a plaintiff must establish that "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

"With respect to the second and third elements, the Second Circuit has defined 'adverse action objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights.'" *Burrell v. DOCCS*, 655 F. Supp. 3d at 130 (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)). This test applies "even where a particular plaintiff was not himself subjectively deterred" from exercising his First Amendment rights. *Gill*, 389 F.3d at 381. And a causal connection can be established circumstantially—that is, "by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

The DOCCS Defendants argue that Zielinski has failed to state a viable retaliation claim because he does not plausibly allege a causal connection between a protected activity—the sending of his op-ed that was critical of prison conditions—and any adverse action. *See* Docket Item 125-1 at 17. This Court disagrees.

As Zielinski notes, *see* Docket Item 135 at 20, the amended complaint alleges that right after[30] he tried to email the op-ed, the defendants sent "a fictitious 'suicide

[30] The amended complaint does not say exactly when the fake suicide alert was sent relative to when Zielinski tried to send the op-ed. But drawing all inferences in Zielinski's favor, the allegations suggest that the suicide alert was

alert'" to the New York State Office of Mental Health, *see* Docket Item 104 ¶ 56. And it alleges that a suicide alert is a "common form of retaliation in DOCCS prisons" because it may result in "moving the [inmate] to an isolation cell with no communication access . . . under extremely onerous conditions." *Id.* "The Second Circuit has held that an adverse action occurring 'just days' after the plaintiff's protected activity raises a genuine dispute of fact about the causal connection." *Wright v. Snyder*, 2023 WL 6379451, at *11 (D. Conn. Sep. 30, 2023) (quoting *Bennett v. Goord*, 343 F.3d 133, 138 (2d Cir. 2003)). Because the alert here presumably was sent even sooner than "just days" after he attempted to send the draft op-ed, Zielinski has raised a plausible claim that the spoof suicide alert was retaliation for his attempt to send his draft out for publication.

With that timing as a backdrop, the DOCCS Defendants' causation arguments fail for two reasons. First, their reliance on caselaw for the proposition that "it is difficult to establish one defendant's retaliation for complaints against another defendant," Docket Item 125-1 at 17 (citing *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2021)), is misplaced because Zielinski's op-ed did not complain about another officer but about prison conditions in general. And second, although the DOCCS Defendants are correct that Zielinski does not specify the DOCCS official responsible

---

issued immediately afterward. *See* Docket Item 104 ¶ 56 (alleging that "[o]n or about August 21, 2022, the defendants, including Leonard and Wolcott, shadow blocked outbound correspondence containing an op-ed" and "then retaliated . . . by sending a copy of [the op-ed] to [New York State] Office of Mental Health . . . staff at the facility with a fictitious 'suicide alert'"); *id.* ¶ 57 (next alleging events that occurred only three days later). And in his briefing on the motion to dismiss, Zielinski uses the word "immediately" to describe the timing. *See* Docket Item 135 at 20 ("[T]he alert notice *immediately* followed Mr. Zielinski's attempt to send an op-ed critical of DOCCS for publication.").

for the fake suicide alert, he also alleges that the message "could only have been provided by a DOCCS employee at" Leonard's rank "or higher"[31] because only those at that level had access to an inmate's email account. Docket Item 104 ¶ 56.

Drawing all inferences in Zielinski's favor, the allegations in the amended complaint are more than sufficient to establish Leonard's or Wolcott's involvement in the fake suicide alert. And for that reason, Zielinski's First Amendment retaliation claim survives dismissal.

### D. Void for Vagueness

Zielinski also says that Directive 4425 is void for vagueness. Docket Item 104 ¶¶ 110-11. "[T]he Supreme Court has explained" that "under the Due Process Clause, 'the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Reynolds*, 25 F.4th at 96 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "[T]]he void-for-vagueness doctrine is most classically applicable to criminal statutes," *Dubarry*, 2022 WL 4485359, at *10, but the Second Circuit has considered vagueness challenges to prison regulations on the basis that those regulations often "carr[y] penalties which are more akin to criminal rather than civil penalties," *Reynolds*, 25 F.4th at 95 (quoting *Chatin v. Coombe*, 186 F.3d 82, 86-87 (2d Cir. 1999)).

[31] Wolcott is the only named defendant from Attica with a higher rank than Leonard. Docket Item 104 ¶¶ 8, 56.

Such penalties are not possible under Directive 4425, which will "punish" an inmate only by withholding emails found to violate DOCCS policy. But in considering a challenge to a Connecticut prison regulation that had "no disciplinary mechanism," the Second Circuit recently concluded that even prison regulations that carry no penalties can be the subject of a void-for-vagueness challenge. *See id.* at 95-96. The reason for that, the court noted, was that even if an unconstitutionally vague prison regulation carries no disciplinary mechanism, it still can result in constitutional injuries such as viewpoint discrimination. *See id.* The Court therefore will address Zielinski's vagueness challenge in light of that decision.

The "degree of specificity required in prison regulations is not the same as that required in other circumstances." *Id.* (citations and internal quotation marks omitted). In fact, prison regulations need only "certain minimal standards of specificity." *Id*. But as the Second Circuit also has made clear, "prisoners are not required to integrate multiple directives in order to divine the rules governing their conduct." *Farid v. Ellen*, 593 F.3d 233, 241 (2d Cir. 2010). So while prison regulations need not be as specific as laws that define criminal conduct, they still must give prisoners some idea of what they can and cannot do.

Zielinski says that his void-for-vagueness claim "is simple: [t]he 'review' process for electronic communications has no actual standards." Docket Item 135 at 25. According to him, because Directive 4425 provides only that "[s]ecure messages and associated attachments that violate policy will be rejected," Docket Item 104-2 at 8, inmates and their correspondents outside prison must "divine" the rules from other DOCCS regulations and are at the mercy of arbitrary enforcement, Docket Item 135 at

25. In other words, Zielinski suggests, inmates using the tablet program must search for—and integrate—other directives to determine whether their email messages might be withheld. *See* Docket Item 135 at 25. And that leaves inmates guessing about what they can and cannot include in their emails.

As but one example of many, Zielinski says that one of his messages was rejected for referring to explosives, *see* Docket Item 104 ¶ 59, something that appears nowhere in Directive 4425—nor, for that matter, in Directive 4422. Apart from the issue of whether the message actually included that reference—Zielinski says that it did not—the Court cannot see how anyone would have known from reading Directive 4425 that message about, say, fireworks would violate DOCCS policy. At this stage, Zielinski therefore has plausibly alleged that insofar as it provides that "[s]ecure messages and associated attachments that violate policy will be rejected," Directive 4425 is void for vagueness.[32] *See Chatin*, 186 F.3d at 84 (prison rule that prohibited "[r]eligous services, speeches[,] or addresses by inmate other than those approved by the Superintendent" was unconstitutionally vague, and vagueness was not cured by DOCCS directive and separate memorandum clarifying that rule covered individual, silent prayer).

[32] Zielinski does not say how JPay is a proper subject of a void for vagueness challenge, and the Court does not see how JPay played any role in the vagueness of Directive 4425—a directive that JPay had no part in enacting. To the extent Zielinski's void-for-vagueness claim is brought against JPay, that claim therefore is dismissed.

### E. Unconstitutional Conditions

Zielinski also alleges that the defendants have imposed unconstitutional conditions by limiting his ability to send and receive electronic messages using his tablet. Docket Item 104 ¶¶ 115-16.

"The unconstitutional conditions doctrine prevents the government from 'burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.'" *Boehringer Ingelheim Pharms., Inc. v. United States Dep't of Health and Human Servs.*, 150 F.4th 76, 96 (2d Cir. 2025) (quoting *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013)). Under this doctrine, "the government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance." *Alliance for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 651 F.3d 218, 231 (2d Cir. 2011). "Put differently, the government may not produce indirectly 'a result which it could not command directly.'" *Boehringer*, 150 F.4th at 96 (alteration omitted) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)); *see also Deniran v. Museum of Modern Art*, 2022 WL 3030508, at *3 (S.D.N.Y. June 17, 2022) ("The unconstitutional conditions doctrine prevents the government from coercing people into giving up their constitutional rights." (emphasis omitted)), *report and recommendation adopted*, 2022 WL 3030513 (S.D.N.Y. Aug. 1, 2022).

Zielinski's claim certainly is creative. What is more, neither set of defendants address it at length (if at all), perhaps because caselaw applying the doctrine in the context of prisons is sparse. On its face, the amended complaint plausibly alleges such a claim by pleading that Zielinski's use of a benefit—something all defendants say

applies to the email system—is conditioned on complying with a policy that violates his constitutional rights. The Court therefore will not dismiss that claim against the DOCCS Defendants. But because that doctrine prevents only "the government from coercing people into giving up their constitutional rights," *Deniran*, 2022 WL 3030508, at *3 (emphasis omitted), Zielinski's unconstitutional conditions claim against JPay is dismissed.

**F. Fourth Amendment**

Finally, Zielinski raises a Fourth Amendment claim against all defendants. More specifically, he alleges that Directive 4425 permits the defendants to read emails sent to and from incarcerated individuals without "good or reasonable cause." Docket Item 104 ¶ 118. And he says that violates the Constitution's protections against unreasonable searches and seizures*. Id.*

"[T]he Fourth Amendment . . . requires that searches—even those in the prison context—be reasonable." *Hodges v. Stanley*, 712 F.2d 34, 35 (2d Cir. 1983). But generally speaking, "the 'interception of an inmate's prison correspondence does not violate that individual's . . . Fourth Amendment rights if the prison officials had good or reasonable cause to inspect the mail." *Rasheen v. Adner*, 356 F. Supp. 3d 222, 232-33 (N.D.N.Y. Jan. 28, 2019) (quoting *United States v. Felipe*, 148 F.3d 101, 108 (2d Cir. 1998) (alteration and some internal quotation marks omitted)). Reading mail for no reason, on the other hand, may not pass muster. *See Felipe*, 148 F.3d at 107-08.

Even in light of the diminished privacy rights to which prisoners are entitled, Zielinski plausibly raises a Fourth Amendment claim based on Directive 4425. Try as it might, the Court cannot square a policy that automatically monitors all emails with

*Felipe*'s requirement that any search be based upon "good or reasonable cause." *See* 148 F.3d at 108. And while Fourth Amendment protections require some justifiable expectation of privacy as a prerequisite, *see generally Katz v. United States*, 389 U.S. 347 (1967), nothing before the Court suggests that the tablets provide the same kind of privacy warning that other courts have found sufficient to defeat analogous Fourth Amendment claims, *see, e.g.*, *Walen*, 2009 WL 3012351, at *5 (no expectation of privacy when phone calls "were preceded by a warning that 'this call is subject to monitoring and recording'" (citation omitted)). Zielinski's Fourth Amendment claims therefore may proceed.

## III. QUALIFIED IMMUNITY

In their motion to dismiss, the DOCCS Defendants argue in passing that the action against them should be dismissed based on qualified immunity. *See* Docket Item 125-1 at 26-27. Under that doctrine, "[g]overnment officials are 'shielded from liability for civil damages [for] conduct [that] does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vega v. Miller*, 273 F.3d 460, 466 (2d Cir. 2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation and internal quotation marks omitted).

On a motion to dismiss, "a defendant asserting a qualified immunity defense . . . 'faces a formidable hurdle . . . and is usually not successful.'" *Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) (summary order) (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006)); *see also Chamberlain*

*ex rel. Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir. 2020) ("[A]dvancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch."). That is because a plaintiff opposing a motion to dismiss "is entitled to all reasonable inferences from the facts alleged," including those that defeat the qualified immunity defense. *See Hyman v. Abrams*, 630 F. App'x 40, 42 (2d Cir. 2015) (summary order) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). Therefore, a district court may grant a motion to dismiss based on qualified immunity only in the rare case where the "defense is based on facts appearing on the face of the complaint" and "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *See McKenna*, 386 F.3d at 436 (second excerpt quoting *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992)). This is not that rare case.

First, as noted above, qualified immunity extends only to damages claims—not requests for injunctive or declaratory relief, both of which Zielinski makes. So even if the DOCCS Defendants are correct in saying that Zielinski does not allege the violation of a clearly established right, that would not warrant the outright dismissal of the DOCCS Defendants from this action. *See Tanvir v. Tanzin*, 120 F.4th 1049, 1059 (2d Cir. 2024) ("Any claim for damages against officials in their individual capacities, however, 'implicates the doctrine of qualified immunity.'" (quoting *Tripathy v. McKoy*, 103 F.4th 106, 116 (2d Cir. 2024))); *Vincent v. Yelich*, 718 F.3d 157, 177 (2d Cir. 2013) ("[Q]ualified immunity does not protect a public official against a claim for declaratory or injunctive relief.").

And second, the DOCCS Defendants do not say *which* defendants are specifically entitled to qualified immunity and on which claims. Indeed, when they expand on their qualified immunity argument in reply, the DOCCS Defendants say simply that Zielinski cannot demonstrate a clearly established right "as to how his electronic communications are reviewed," Docket Item 141 at 12; they say nothing about how qualified immunity shields the defendants who Zielinski says were involved in retaliating against him—Leonard and Wolcott. And as to Zielinski's First Amendment and procedural due process claims, a "general constitutional rule . . . may apply with obvious clarity . . . even though the very act in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Here, the clearly established rules governing physical mail—which the defendants admittedly did not follow for emails—might well give rise to a clearly established right that was abridged.

Indeed, other courts confronting analogous claims have concluded—on summary judgment with the benefit of a fully developed record—that *Martinez* "has given prison officials fair warning since" 1974 "that failing to notify an inmate that correspondence was being withheld is unconstitutional"; and those courts also have observed that "[n]umerous subsequent decisions have given fair warning that [*Martinez*] applies to more than just letters." *Tory*, 2024 WL 3331668, at *6 (citing *Moyler*, 2023 WL 2541131, at *11). Along the same lines, *Felipe*—a decision nearing its 30th birthday—has long established that prison officials in this Circuit need "good or reasonable cause to inspect the mail." 148 F.3d at 108 (internal quotation marks omitted).

As is the case for many other issues discussed above, the story with qualified immunity may well change on summary judgment. But the Court will not prematurely

reach the qualified immunity question without a fully developed factual record, along with a more specific showing from the DOCCS Defendants as to how qualified immunity specifically shields each named defendant.[33]

## CONCLUSION

For the reasons stated above, JPay's motion to dismiss, Docket Item 119, and the DOCCS Defendants' motion to dismiss, Docket Item 125, are both GRANTED IN PART and DENIED IN PART. JPay and the DOCCS Defendants shall answer the amended complaint consistent with the Federal Rules of Civil Procedure.

SO ORDERED.
Dated: September 30, 2026
Buffalo, New York

***/s/ Lawrence J. Vilardo***
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

[33] Qualified immunity applies to only claims for damages brought against defendants in their individual capacities. *See Lynch v. Ackley*, 811 F.3d 569, n.11 (2d Cir. 2016) ("Qualified immunity applies only to a plaintiff's claim against an individual state actor for damages"); *Rossy v. City of Buffalo*, 2025 WL 816301, at *5 (2d Cir. Mar. 14, 2025) (summary order) ("[Q]ualified immunity . . . only applies to individual capacity claims."). Moreover, neither set of defendants discusses Zielinski's requests for declaratory and injunctive relief in their motions to dismiss. *See generally* Docket Items 119 and 125.